## Case No. 3,410.

### CROMWELL et al. v. The ISLAND CITY.

[1 Cliff. 221.] [1]

Circuit Court, D. Massachusetts. May Term, 1859.

SALVAGE—DERELICT— COMPENSATION—EMBEZZLEMENT.

1. A disabled bark in tow of a steamer was anchored and left for a necessary and tempo-

---

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

rary purpose. The officers and crew of the bark went on board the steamer; but nothing was taken out of the bark, it being the intention to return and take her to a place of safety at the earliest practicable moment, which intention was carried into effect. *Held*, the bark was not derelict when found by another vessel, during the steamer's absence.

2. But when a party finds property thus temporarily left, whether from necessity or other cause, and he takes possession of it with the bona fide intention of returning it to the owner, and if by his exertions he contributes materially to the preservation of the property, he will be entitled to remuneration as a salvor, according to the merits of the service.

[Cited in The Blackwell v. Sancelito Water & Steam-Tug Co., 10 Wall. (77 U. S.) 14.]

3. In this case the vessel saved was, with her cargo, worth $70,000; the steamer that rendered the service, with her cargo, $90,000. Salvage decreed to the owners of the steamer, $1,500; and in the absence of any charge of embezzlement or theft, $3,000 would have been adjudged to the officers and crew.

[Cited in The Camanche v. Coast Wrecking Co., 8 Wall. (75 U. S.) 475.]

4. But where all, or nearly all, the personal effects of the officers and crew of the bark saved were embezzled, locks being broken, chests and trunks forced open, and these acts of plunder committed by the crew of the rescuing steamer. under circumstances which showed that her officers either connived at them, or were grossly negligent in failing to prevent them, and in not causing the property to be restored. *Held*, that the salvage that would otherwise be decreed to the officers and crew of the steamer was forfeited to the owners of the property saved.

[Cited in New York Harbor Protection Co. v. The Clara, 23 Wall. (90 U. S.) 17; U. S. v. Stone, 8 Fed. 251.]

[Appeal from the district court of the United States for the district of Massachusetts.]

This, like the two preceding cases [i. e. Adams v. Island City, Case No. 55, and Norris v. Same, Id. 10,306, which were claims for services rendered to the same vessel], was a libel [by Henry B. Cromwell and others, owners, etc., of the steamship Westernport] claiming to recover for a salvage service, and was also certified to this court. The circumstances under which the service was rendered appear in Adams v. The Island City. [Case No. 55]. It appeared in this case, that, after the bark was taken into a place of safety, the crew of the steamer Westernport were allowed to break open the chests of seamen and officers of the bark, and take out their contents, which consisted of clothing, money, and other articles.

R. H. Dana, Jr., and Daniel W. Gooch, for libellants.

The elements necessary to constitute salvage: (1) A marine peril; (2) voluntary service upon contingent compensation; (3) success. The Henry Ewbank [Case No. 6,376]; The India, 1 W. Rob. Adm. 406; The Dodge Healy [Case No. 849]. The services of the Kensington's crew had the two former requisites, but failed in the last. As to the R. B. Forbes, there is no claim for salvage. She

was engaged by the owners of the Island City, in their service, and subject to their order. The employment of the Forbes could have been terminated at any moment by the owners of the bark. The libel of the Forbes is solely to obstruct the claim of the Westernport. The service of the Westernport was salvage in its nature. The Island City was derelict in the sense of the law of salvage. In the salvage laws, derelict means deserted, with or without the hope of returning. The test is the power of resuming possession. The Amethyst [Id. 330]; The John Gilpin [Id. 7,345]; The John Wurtz [Id. 7,434]; Rowe v. The Brig [Id. 12,093]. In cases like this the rule is to give one half for all the salvage. The Boston [Id. 1,673]; Sprague v. Barrels Flour [Id. 13,253]; The Galaxy [Id. 5,186]; L'Esperance, 1 Dod. 46; The Frances Mary, 2 Hagg. Adm. 90; The Elliotta, 2 Dod. 75; The Reliance, 2 Hagg. Adm. 91, note; The Eugene, 3 Hagg. Adm. 156; The Effort, Id. 166; Twee Gebroeders, Id. 431, note; The Watt, 2 W. Rob. Adm. 70; The Nicolina, Id. 175; The Britannia, 3 Hagg. Adm. 154.

Reasons for high rate of salvage in this case: The vessel saved was derelict. The service was solely by libellants. She was in immediate peril. Service was successful. Salving vessel was a steamer. The Gen. Palmer, 5 Notes Cas. 159, note. Chances of reasonable relief from other sources were small. The articles taken from the Island City by the men of the Westernport were so taken to protect themselves from the severity of the weather. If the Forbes was not acting as agent of the owners of the Island City, then she was a mere trespasser on the Kensington's possession.

B. R. Curtis and William Dehon, for claimants.

CLIFFORD, Circuit Justice. On this state of facts, it has already been determined, in the case of Adams v. The Island City [Case No. 55], that the steamer is entitled to a salvage compensation. Her counsel, however, insist that the bark was derelict, and that the amount of the compensation to be allowed should be ascertained upon the principles applicable to cases of derelict. Reference to the facts, as already stated, will show that the theory of fact assumed by the counsel cannot be sustained. When the officers and crew of the steamer anchored and left the bark, it was with the openly declared intention of returning, and the same remark applies to the master of the bark and her crew. They left for a necessary and temporary purpose, with the intention of returning, and actually carried that intention into effect at the earliest practicable moment. Suffice it to say, without repeating the testimony, that their efforts in that behalf were unceasing from the moment they reached Provincetown, where it was expected they would find suitable coal, until they finally returned. One great cause of danger was the ice, and no doubt is entertained, from the evidence, that the place where the bark was left by the R. B. Forbes was one less exposed in that respect than the one she previously occupied. She was left in as safe a condition as the means at hand would allow. No more could have been done had her crew remained, and as they were destitute of provisions, or nearly so, it was not an unreasonable step on the part of the master to allow the crew to accompany the steamer to Provincetown. Property is not in the sense of the law derelict, and the possession left vacant for the finder, until the hope of recovering it is gone, and the intention of returning is finally given up. But when a party finds property thus temporarily left to the mercy of the elements, whether from necessity or any other cause, and he takes possession of it, though it is not finally abandoned and derelict, with the bona fide intention of saving it for the owner, he will not be treated as a trespasser. On the contrary, if by his exertions he contributes materially to the preservation of the property, he will entitle himself to a remuneration as a salvor, according to the merits of the service rendered. The Bee [Id. 1,219]. It is not enough that the officers and the crew left the vessel, unless it also appears that she was so left without any intention on their part of returning to the vessel. Tyson v. Prior [Id. 14,319]. To constitute a case of derelict, it is not sufficient that the vessel was abandoned, but it should also appear that the abandonment was without the hope of recovery, and without the intention of returning to the vessel. The Aquila, 1 C. Rob. Adm. 41. All the cases show that the mere quitting of the ship, for the purpose of procuring assistance from shore, and with the intention of returning to her, is not an abandonment. The Beaver, 3 C. Rob. Adm. 293; The Barefoot, 1 Eng. Law & Eq. 661; The Emulous [Case No. 4,480]; The Boston [Id. 1,673]. Unexpected difficulties and delay had been encountered by the steamer, and her master finding that his coal was nearly consumed, and that the crew of the bark were destitute of provisions, concluded to go to Provincetown after supplies, and the officers and crew of the bark decided to go in the steamer, it being fully understood that all would return to the bark at the earliest practicable moment. Intention to return in this case is fully proved, and as a matter of fact was actually carried into effect without any previous knowledge that the bark had been removed from the place where she had been left by the steamer and her own crew. These considerations lead necessarily to the conclusion that the proposition that she was derelict cannot be sustained. Compensation, therefore, in this case, must be ascertained by the same rule and upon the same principles as have been applied in the other cases already decided which grew out of the same

disaster. Thirteen thousand dollars is the whole amount allowed as salvage, and of that sum five thousand two hundred dollars have been adjudged to be the proportion to be paid in the case of Adams v. The Island City [supra], and three thousand three hundred dollars in the case of the schooner Kensington. Deducting these sums from the whole amount allowed, it leaves four thousand five hundred dollars which remains to be adjusted in the case under consideration. One third of that sum is hereby adjudged to the owners of the steamer, leaving the sum of three thousand dollars, which, in the absence of any charge of embezzlement, theft, wanton destruction of the property saved, and gross carelessness, would be adjudged to her officers and crew.

But whatever salvage may have been earned by the master, officers, and crew of this steamer, it is insisted by the respondents, was forfeited by embezzlement and by gross negligence. That embezzlement of the most censurable kind, such as robbing the chests of shipwrecked mariners, actually took place is clearly proved, not merely in a single instance, but extensively, and upon a plan of general plunder of their effects. The master of the bark first went on board, after his return from Provincetown, on the 1st of February. She was then in possession of the crew of the Westernport. On going into the cabin he found a trunk broken open which was on freight. It contained a few clothes and papers, and was filled with pecan-nuts, and similar nuts were scattered all about the cabin. He then went ashore; and on returning and looking round, he found that all his clothes were gone. Complaint was then made to the mate of the steamer, and most of the articles were returned. When he left the bark to go to Provincetown his chest contained sixty-five dollars in money, and that also was gone. Of that sum twenty-five dollars were returned by the mate. Forty-two dollars, belonging to his sister, he says, was rolled up in a newspaper, and there was alongside of it in the till of his chest his purse, containing twenty-three dollars in gold and silver. That purse and its contents were gone, and were not returned. His loss, in addition to the money already mentioned, he estimates at ten dollars, consisting, among other things, of a dozen and a half of socks, his razor, a pair of flannel drawers, and two or three silk handkerchiefs. Several of the seamen were also examined, and they also testify that their chests were broken open and pillaged of their contents. One of them, George Patten, testifies that he had forty-three dollars in money in his chest, and that when he went on board he found the chest broken open and the money gone. Other things had been taken from the chest, such as a quadrant, his coat, socks, drawers, and other small articles. Twenty-four dollars and fifty cents of the money were returned to him by

the mate in about two hours after he went on board. He says that the chest of the master, the trunk of the mate, the chests of two of the seamen in the forecastle, and the chest of the carpenter, were also broken open. After ascertaining what had been done, he complained of his loss, first to the mate of the bark, and then to the engineer of the steamer, and that the latter promised him to return what articles they had in their possession. Some of the articles of clothing were returned to him by two of the crew, and the mate gave him back the quadrant. His loss in money and clothing amounts to twenty-five dollars and fifty cents. Others also were robbed of their effects in the same way, and among the number was the mate of the bark. He estimates his loss at seventy-five or eighty dollars, consisting for the most part of articles of clothing, and including his watch, razors, clothes-brush, and some books. Some of the articles he saw on board, and he also says that the mate of the steamer told him that he took the quadrant and barometers of the ship, and such things, himself. Another seaman, Hiram Wallis, testifies that his chest was split and broken open, and everything taken out. His loss was twenty dollars, chiefly in articles of clothing, and exclusive of what was returned. Some of the seamen had no chests, and left their clothing in the bark, as they had been in the habit of keeping it, in carpet-bags. Those also were rifled and robbed of their contents. Charles McCarty testifies that he lost all of his clothing, valued at twenty dollars, and none of it was returned. He complained of his loss, and was told by two of the crew of the steamer that the mate went down first into the forecastle, and broke open the chests, and took out what he thought was worth taking, and that the crew afterwards followed him. Clothing was also lost by Isaac McGowan, another seaman, to the amount of twenty dollars, and he says he heard the mate of the steamer acknowledge that he had overhauled the chest of the master of the bark. Another seaman, by the name of John Williams, also lost clothing and other articles of the value of thirteen or fourteen dollars, and he says that the chests, when he went on board at Hyannis, were all broken open, and everything was taken out of them. He also says that two of the crew of the steamer told him that the mate and engineer of the steamer went down first into the forecastle, and when the crew got there the chests had been broken open. Two of the seamen of the bark were taken sick at Provincetown, and did not return. They were both examined as witnesses, and each testifies that he had lost some seventeen or eighteen dollars in clothing, and such other articles as are usually kept by seamen in their chests.

These references to the testimony are believed to be sufficient to show that a general plan of embezzlement, so far as respects the

effects of the officers and crew of the bark, was actually practised by. the crew of the steamer, and that the mate and other officers in charge of the property saved either participated in the robbery, or were so grossly negligent in the performance of their duty to protect it against such practices as to render them equally culpable. When the bark was anchored near the wharf, the master of the steamer was on board, and he admits that he remained there until he set the watch, and then he went on shore to visit his family. His duty plainly required him to prevent such open violation of law by those under his command, and it is not doubted that the mate and other officers and crew might have been restrained if he had exercised proper diligence in enforcing the authority with which he was invested. Whether the chests were broken open before or after he went on shore does not very clearly appear. One thing, however, is certain, little or no effort was made on the part of the master of the steamer to cause restitution to be made after he returned, and there is much reason to infer from the evidence that the depredation had been commenced before he left the vessel. As a master mariner, he well knew that the seamen, shipwrecked as they were in midwinter and in weather of almost unparalleled severity, were in need of all their clothing, and his failure to exert himself to cause it to be restored adds something to the other grounds of inference that he was guilty of gross negligence in suffering this outrage to be committed. Open embezzlement, such as was practised in this case, stands upon a somewhat different principle in that behalf from secret theft. Orders from the master, however strict, might not prove sufficient to prevent the latter, while they would in general be an ample safeguard against the former. According to the testimony, the master of the steamer admitted in effect that he expected pilfering, and yet he took no measures to guard against it; and when complaint was made, and he found that his expectations had been realized, he was indifferent to the calls for redress. All of the crew who did not actively participate in the plunder, if any such there were, must have been aware that it had taken place, and it was the imperative duty of every man to have exerted himself to have it restored; and in this respect they were guilty of culpable negligence and wilful default. Considering that so brief a period had elapsed after the bark was anchored at the wharf before the officers and crew of the bark arrived, it is scarcely possible that the money had been expended or the property consumed. And if not so, then it might have been returned. No discrimination, therefore, can be made in favor of any one of the officers or crew, and the claim of each salvor must abide the conclusion to be drawn from the general conduct of the whole company. Salvage property is always from necessity more or less exposed to be plun-

dered by the salvors, and when found unoccupied, whether derelict or otherwise, it is peculiarly so, because the owner then being absent, has no power to protect it, either by himself or his agents. Public policy encourages the hardy and industrious mariner to engage in these laborious and sometimes dangerous enterprises, and with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him, in case he is successful, a liberal compensation. Those liberal rules as to remuneration were adopted and are administered, not only as an inducement to the daring to embark in such enterprises, but to withdraw as far as possible every motive from the salvors to depredate upon the property of the unfortunate owner. While the law is thus liberal as to compensation, it requires on the part of the salvors the most scrupulous fidelity. It visits, says a learned judge, any embezzlement, although small, with an entire forfeiture of all claim for salvage. It not only withholds the extraordinary reward allowed to the honest salvor as a premium for his courage and hardihood, but, by way of penalty for his fraud, deprives him even of a quantum meruit for his labor. The Rising Sun [Case No. 11,858]; The Duke of Manchester, 2 W. Rob. Adm. 478; The Barefoot, 1 Eng. Law & Eq. 661. While the general interests of society require that the most powerful inducements should be held out to men to save life and property about to perish at sea, they also require, says Chief Justice Marshall, that those inducements should likewise be held forth to a fair and upright conduct with regard to the objects preserved. Mason v. The Blaireau, 2 Cranch [6 U. S.] 240. Judge Story held, in the case of The Boston [supra], that compensation for salvage service presupposes good faith, meritorious service, complete restoration, and incorruptible vigilance, so far as the property is within the reach or under the control of the salvors. Salvors are required by the nature of their undertaking, and by a due consideration of the large award allowed them for their services, to be vigilant in preventing, detecting, and exposing every act of plunder upon the property saved; and if they are guilty of embezzlement, whether at sea, in port, or even after the property is delivered into the custody of the law, it works a forfeiture of their claim to salvage. When secret, and purely an individual act, it is justly held not to prejudice co-salvors who are innocent. But all may become guilty by consenting thereto, or by connivance, concealment, or encouragement afforded to the actors, or by not preventing the act when it is in their power. Apply these principles to the facts of the case as already ascertained, and it is obvious what the decision must be. All, or nearly all, of the personal effects both of the officers and crew of the bark were embezzled within a few hours after she was anchored at the wharf. Locks were broken, chests and trunks forced open, clothing, mon-

ey, and other articles of value to the mariner carried away and never returned; and these acts of plunder were committed under circumstances which, within the principles here laid down, implicate all of the officers and crew of the steamer, and therefore render all responsible for their commission. For these reasons it is adjudged that the entire portion of the salvage compensation allowed in this case, which would otherwise be due to the officers and crew of the steamer, be considered as forfeited to the owners of the property saved.