## Case No. 14,608.

### UNITED STATES v. BLAISDELL et al.

[3 Ben. 132.[1] 9 Int. Rev. Rec. 82.]

District Court, S. D. New York. Jan. 22, 1869.

INTERNAL REVENUE — FRAUDULENT REMOVAL OF
SPIRITS—AIDING AND ABETTING—EVIDENCE OF
ACCOMPLICES — PLEDGES OF PROTECTION — DIS-
TRICT ATTORNEY—SENTENCE.

1. Under the 45th section of the internal revenue act of July 13, 1866 (14 Stat. 163), the "place where spirits are distilled" is the distillery premises.

2. Under that section, a person cannot be convicted as a principal in removing spirits, and also as an aider and abettor in the same offence.

3. Under that section, any one who had an interest in the distillery, if he directed, ordered or set on foot the removal of spirits, may be convicted of such removal, though not personally present.

4. Any one personally concerned in handling the means of removing spirits is guilty of removing spirits, whether he is interested in them or not.

5. Any help or assistance, other than what is a removal, is an aiding in a removal; and giving any encouragement or instigation to commit a removal, other than what is defined to be a removal or an aiding in a removal, is an abetting in a removal.

6. Unless the date, stated in an indictment, is of the essence of the crime, it need not be proved as alleged.

7. It is never safe to convict upon the uncorroborated evidence of a single accomplice.

8. Affidavits and statements previously made by witnesses, which contradict their evidence given on the stand, are to be considered by the jury for the purpose of finding out what is the truth; but the evidence of the witnesses on the stand is not necessarily to be rejected on account of such contradiction. If, after having ascertained what is the truth, the jury find that a witness has wilfully told a falsehood on the stand, as to a material fact, they have a right to believe that he is not worthy of credit in any particular.

9. Courts of the United States cannot be called upon to redeem pledges of protection which have been given to criminals by the executive de-

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

partment. Such pledges must be redeemed by the executive department.

10. The court can communicate with the executive authorities of the government, only through the district attorney as the recognized officer of the government.

[Cited in U. S. v. Lawrence, Case No. 15,-573; U. S v. Stone, 8 Fed. 261.]

11. Where a criminal is convicted of several offences, under several counts of an indictment, he may be sentenced under the first count, and sentence may be suspended upon the conviction under the other counts till after the first sentence has been fully executed.

These defendants [Alvah Blaisdell, John J. Eckel and John McClaren] were indicted under the forty-fifth section of the internal revenue act of July 13th, 1866, for violations of that law in connection with a distillery in Christopher street, New York. The distillery ran during August, September and October, 1867, and was seized on November 3d, 1867. After being condemned it was sold and ran again during April and May, 1868, when it was again seized. The indictment in this case contained eight counts, three founded upon a removal of spirits from the place where they were distilled to a place other than a bonded warehouse, (one of them during the first run, and two under the second run, of the distillery,) three for aiding and abetting in such removal, (two under the first run and one under the second,) and two for failing to keep proper books. These last, however, were not sustained by evidence and were not submitted to the jury.

BLATCHFORD, District Judge. [2] [Gentlemen of the Jury: The case now before you, which has occupied your attention for the last six or seven days, is a case which, in the judgment of the court, is as important in the public principles involved in it, and in its materiality to the cause of justice and the public order and well-being of the community, as any case that has ever come before a judicial tribunal in the United States. The reason why I make this remark is this, that in the present condition of the affairs of this country, the collection of the internal revenue, and particularly the collection of the internal revenue upon distilled spirits, is as important as any question connected with the collection of the revenue; and the question of the collection of its revenue, the preservation of its credit, and the punctual payment of its debt, is the great question that concerns these United States, and every one living in them, and every one of you, gentlemen of the jury. more than any other public question that now exists in this country. It was suggested to you, in the course of the summing up in this case, that it could not be understood, and was not seen, why this cause attracted so much public attention. It is because, gentlemen, even now, with the imperfect collection that we have of the revenue from distilled spirits,

[2] [From 9 Int. Rev. Rec. 82.]

the revenue from distilled spirits and tobacco is almost one-half of all the internal revenue that is collected in the United States. and therefore, any illicit means that are resorted to to defraud the government of its tax upon distilled spirits strikes at the very vitals of its revenue system. There is another reason why this cause is one of such large public importance. It is, that notwithstanding there have been many prosecutions, both civil and criminal, tried in this court, and in the circuit court for this district, and in the courts of the United States in other districts, under the internal revenue laws, yet this cause, so far as my recollection extends, has developed an exposure of the machinery, the fraud, the perjury, by which this business of the illicit removal of spirits has been carried on, more completely than any other cause that has ever been tried under those laws in any court of the United States. The whole modus operandi has been laid bare, so that the court, and the jury, and the community, understand exactly how the thing has been done, and what has been long understood to be the system of running spirits from distilleries to rectifying houses in close juxtaposition, has been fully and thoroughly developed. In this connection, I refer to some of the affidavits which were read in this case, made by some of the witnesses who have been examined upon the stand on this trial, and made for use in the civil action against the distillery for its forfeiture, by which it appears, that when this distillery in 45th street was seized on the first occasion, the 3d of November, 1867, under the instructions of Mr. Bailey, the collector of the Fourth collection district of this city, the public officers were entirely satisfied that whiskey was carried from the distillery to the rectifying house adjoining by means of a hose attached to the pipe which was found running under ground, beneath the distillery yard, from the distillery to the rectifying house, but yet the means whereby the whiskey was taken from the receiving-cisterns in the cistern-room was not ascertained. The idea was, that it was taken out by a hole in the top of the cistern, and was thence carried by a hose through the window down to the pipe before-named, and through that to the rectifying house. It was supposed that it was raised from the cistern by a pump or a syphon, or some apparatus of that sort, by which it reached a level from which it started to go down by the force of gravity to the rectifying house. That idea, if the testimony on this trial is to be believed, was an erroneous one. It was not suggested in the affidavits referred to, or during the prosecution of the civil suit, that the way in which the spirits were removed out of the cistern-room was, by opening the door of that room and attaching the hose to a cock which was properly there, and was placed there to be used for drawing off into barrel spirits to be inspected by government officers, and to be

branded by them and put into the market for sale. In that respect, this case is important; for, if the evidence is to be believed, we now see precisely how the thing was done.

[I have referred to the prosecutions that have taken place under the internal revenue laws in this and other districts, and by reason of what has been stated on this trial, I deem it proper to say, that this is by no means the first whiskey prosecution, civil or criminal, that has passed under the cognizance of this court. I have sat here for nearly nine months, since I commenced my official term, trying cases with a jury. I have tried, during that period, forty-four cases of prosecutions connected with violations of the law in regard to distilled spirits. Of those forty-four cases, twenty-nine were civil and fifteen were criminal cases. Fifteen persons have been tried by me, in this court alone, for offences connected with distilled spirits. Of that number, thirteen have been convicted and two have been acquitted; and of the twenty-nine civil cases, twenty-seven have resulted in a verdict for the government, and two in a verdict for the claimants. One of the civil cases tried before me, and which resulted in a verdict for the government, was the prosecution of this distillery, on the seizure of it which took place on the 3d of November, 1867, called the "first seizure," after what is called the "first run." There were several other large and important seizures for violations of the provisions of the internal revenue laws in regard to distilled spirits among the cases to which I have referred. Besides all these, there have been a large number of condemnations by default.

[Now, gentlemen, to come to the case directly under consideration, I shall first call your attention to the indictment in this case. It consists of eight counts, and I must ask you to bear in mind carefully what I shall say on the subject of the indictment; because it may become of importance to you in your deliberations. There are three counts in the indictment founded upon a removal of spirits from the place where they were distilled to a place other than a bonded warehouse, as provided by law. There are also three counts for aiding and abetting in the removal of distilled spirits from a distillery to a place other than a bonded warehouse. Of the three counts for a removal, one is under the first run and two are under the second run. By the "first run" you will understand the run in August, September and October, 1867, which was terminated by the seizure of the 3d of November, 1867. By the "second run" you will understand the run embracing portions of the months of April and May, 1868, after the distillery had been sold on its condemnation on its first seizure. In regard to the counts for aiding and abetting in a removal, there are two counts for aiding and abetting during the first run, and one count for aiding and abetting during the second run. There are two other counts in the indictment, the third and the seventh, one under the first run and the other under the second run, for neglecting to keep, as rectifiers, the books required by law. Those two counts you will lay entirely out of view. I instruct you that the evidence will not warrant a conviction of the defendants under either of those counts; and, if a verdict of guilty were to be found on either of them, the court would deem it its duty to grant a new trial. You will, therefore, direct your attention wholly to the counts in regard to the removal of spirits, and the aiding and abetting in the removal of spirits.][2]

The question of time and date, as specified in the indictment, is of no consequence at all in this case. The date alleged in the indictment, in respect of the first run, is the 27th of October, 1867. The dates of removal during the second run are alleged in the indictment to be, one of them, the 1st of April, 1868, and the other the 1st of May, 1868. The date of the aiding and abetting during the second run is alleged to be the 1st of April, 1868. It is necessary, in an indictment, to allege a date, but, unless the date is of the essence of the crime, it need not be proved as alleged. In this case, the dates alleged in the indictment are not at all of the essence of the crime, provided the offence was committed within the statutory time within which a prosecution must be had, which is two years in regard to these offences.

None of the defendants can be convicted of a larger number of single offences than are laid in the indictment; and each count must be considered as charging a single offence. Thus, the first count, that on such a day the defendants removed spirits, is supported by testimony that on any day during the first run they removed spirits from the distillery otherwise than into a bonded warehouse, with intent to defraud the United States. The same is true in regard to the counts for aiding and abetting.

In the investigation of all crimes, the fact that the crime could be committed, that the circumstances surrounding the place where it is alleged to have been committed, were such that the crime could be committed, is always an important circumstance, and is the first subject of inquiry. Thus, in the present case, if it was impossible that whiskey could be conveyed by any means in regard to which testimony is given, no crime could be committed in respect of the illicit conveyance of whiskey, and, therefore, nobody could commit such a crime. Hence, your first inquiry must be directed to the question, whether the means, the facility, the opportunity and the location, existed, so that the crime charged could be committed.

[2] [From 9 Int. Rev. Rec. 82.]

When I speak of "the crime charged," 1 confine my attention, and you will confine your attention, so far as this case is concerned, wholly to the question of the removal of whiskey through the hose and the pipe under ground across the yard, in the manner before named.

If you are satisfied. from the evidence, that the means, facilities, and opportunities existed for the commission of the crime, the next question is, whether the crime was committed, and, if it was, whether these defendants were concerned in it.

In regard to the question whether a defendant was concerned in a crime, it is always an important inquiry, and it is so in this case, whether there was a motive or an interest on the part of the defendant to commit the crime, and whether he had the opportunity to commit it. The interest of these defendants in this distillery, as furnishing a motive to them to remove whiskey from it illicitly. is, therefore, to be taken into consideration by you, as you shall, from the evidence, believe that interest to be.

2 [There have been brought before you in this case, twelve witnesses who may be considered as implicated, to a greater or less extent, in the transactions that have been detailed before you. There are other witnesses who are not at all implicated. Necessarily, in transactions of this kind, in the removal of whiskey in the way in which this whiskey was removed. the witnesses to the transaction—unless the testimony be as to confessions or statements made by the parties concerned to third parties—the ocular witnesses must necessarily be the parties concerned, the parties inside of the establishment. When whiskey is run off clandestinely between the hours of nine to ten o'clock at night and five to six o'clock in the morning, unless the officers of justice rush in at once and seize the parties flagrante delicto, the witnesses must necessarily be those in and about the establishment and concerned in the clandestine business. Therefore, in this case, as in many cases of the kind, there are two classes of testimony—the testimony that comes from inside, from witnesses implicated to a greater or less degree in the matter, either as actors, or as spectators silently or otherwise encouraging the thing, such as paid workmen acting under superior orders; and a second class, the witnesses from outside.

[I shall first direct your attention in this case to the facts that are testified to by witnesses who are not at all implicated in this matter. The first of such witnesses is Mr. Barrows, the revenue officer who went in with the other officers on the night of the 3d of November, 1867. and made the seizure under the direction of Mr. Bailey. I shall call your attention briefly to the facts and circumstances brought out by the testimony

2 [From 9 Int. Rev. Rec. 82.]

of Mr. Barrows. It is, of course, for you to say, gentlemen, whether you believe these things to be facts. My duty is only to call your attention to what the witness has testified to; and it is your duty to say what degree of credibility you will give to him and to all other witnesses. When Mr. Barrows went to this place and seized it, on Sunday night the 3d of November, the establishment was lit up and running. Mr. Barrows testifies, that he found a lock on the cistern-room door. the inner hasp of which was open, in the manner described by him, and which appeared by the lock that was exhibited to you as a lock in a similar condition. Mr. Barrows found the rectifying establishment near to the distillery, with an interval of fifty feet, or less, between them. He also found a pipe under ground, leading from near the distillery wall, under the yard, over to the rectifying house, and through the wall of the rectifying house, a pipe two inches in diameter, with a screw on its end upon which a nozzle could be screwed. He traced this pipe into the rectifying house, and found that it there turned up against an upright post. On the floor of the rectifying house he found, a foot from the pipe, a trap-door. He took up that trap-door, and found that the pipe below was tapped to run out to the Croton water pipe in the street, and had a cock in it which would admit of letting on and shutting off the Croton water from the street. He states, that when the Croton water was shut off from the street, the pipe would be empty and would form a communication from the place where it came out of the ground near the distillery wall, in the yard, to the orifice against the upright post in the rectifying house. He also found that a tub underneath where this pipe came out against the distillery wall, in the yard, at what is called the hydrant, smelt of high wines at that time. He also found a hose in the rectifying place. that smelt of high wines; and, in the stable near the hydrant, he found. in a hogshead of water. a cut hose which smelt of high wines. and which he stated appeared to him to have been freshly cut. He also found in the distillery, in front of the door of the cistern room, a small trap opening to the door below. He found warm mash in the still, fire under every boiler, and men engaged in mashing at the mash tubs.

[In addition to this testimony, public records have been produced in this case. showing that two of the defendants, Blaisdell and Eckel. became bondsmen for Schuyler, the nominal distiller during the first run, and for Connolly, the nominal distiller during the second run. There is also the testimony of Mr. Wheaton. an outside witness, as to the capacity of the distillery, which he states as being. during the first run, from 2.400 to 2.500 gallons in twenty-four hours. He says that they had machinery enough, exclusive of their boiler power, to make more

whiskey than this in twenty-four hours, but that they had not boiler power enough; that they had one boiler not in use; and that, when they got to work during the second run, he found this disused boiler put in use, and a new additional boiler also put in use, which, with the other machinery, was sufficient to give a capacity of 4,000 gallons in twenty-four hours. You also have the records showing that the entire tax paid by this establishment to the government for the whiskey made there during the time it ran—portions of the five months namely, August, September, and October, 1867, and April and May, 1868—was a little over $42,000, covering a little more than 24,000 gallons of spirits—exceeding but slightly the capacity of the distillery during ten days' run, at the lowest figure given by Mr. Wheaton. You have heard the calculation submitted to you by the district attorney as to the amount of tax that the government ought to have received from the spirits distilled at this distillery; and, whether it be taken at the figures stated by him, over $500,000, or at figures very much less, it is quite manifest that the discrepancy between the tax actually paid and the amount that ought to have been paid is enormous.

[There is, also, the testimony of Marshal Murray, as to what took place between him and Blaisdell after the sale of the distillery in March or April, 1868, on its condemnation in February. He says, that after that sale Blaisdell came into his office and said: "You have sold my distillery. These internal revenue men have robbed me, and I am short of funds. I will pay you $4,000 now, on account, and give you my check for the balance"—the balance being $2,000, I believe —"and I want to go to work and make some money."

[Now, gentlemen, with this distillery situated, as the evidence shows, upon higher ground than the rectifying house, with the rectifying house closely adjacent to it, with the trap-door in the floor in front of the door of the cistern room, with the pipe under ground communicating with the rectifying house, you will perceive, even in the absence of all testimony as to the actual running off of spirits from the distillery, that there existed, with a hose stretched, in the distillery, from the cistern room to the pipe in the yard, the means of running off whiskey illicitly, if any person desired to do so. In the investigation of all crimes, the fact that the crime could be committed, that the circumstances surrounding the place where it is alleged to have been committed, were such, that the crime could be committed, is always an important circumstance, and is the first inquiry. Thus, in the present case, if it was impossible that whiskey could be conveyed by any means in regard to which testimony is given, no crime could be committed in respect of the illicit conveyance of whiskey, and, therefore, nobody

could commit such a crime. Hence your first inquiry must be directed to the question, whether the means, the facility, the opportunity and the location, existed, so that the crime charged could be committed. When I speak of "the crime charged," I confine my attention, and you will confine your attention, so far as this case is concerned, wholly to the question of the removal of whiskey through the hose and the pipe underground across the yard, in the manner before named.

[If you are satisfied, from the evidence, that the means, facilities and opportunities existed for the commission of the crime, the next question is, whether the crime was committed, and, if it was, whether these defendants were concerned in it.

[In regard to the question whether a defendant was concerned in a crime, it is always an important inquiry, and it is so in this case, whether there was a motive or an interest on the part of the defendant to commit the crime, and whether he had the opportunity to commit it. I shall call your attention briefly to the testimony in regard to the positions of the defendants Blaisdell, Eckel, and McClaren in connection with this establishment, and it will be for you to draw the proper conclusions from the testimony.

[The first class of testimony is in regard to the interest of Blaisdell and Eckel in this establishment during both the runs, as being concerned in running it, as the real parties engaged in operating it, and therefore interested to remove whiskey away from it. Upon that subject you will consider the testimony in regard to the employment and payment by Blaisdell and Eckel of the hands who worked there, and in regard to their being at the establishment while it was running, and giving instructions to the men. You will also bear in mind what Blaisdell told Barrows, as the latter testifies, on the morning after the seizure—that he was the owner, and that it was a personal warfare on him because it was his place; and the fact testified to by Barrows, that Blaisdell opened for him that morning, with a key, the door of an inside office, and opened, with another key, a desk in that office, to get access to papers to be examined by Barrows. You will also consider the testimony in regard to the payment of men during the last run. One of the witnesses, Nunan, I think, testifies to being paid wages during the last run, at different times, by Blaisdell, Tisdale, Leipsiger, and McClaren, and says that, after the second seizure, Leipsiger paid him once in Blaisdell's house. You will also weigh the testimony of Schuyler and Connolly showing that Blaisdell and Eckel became bondsmen for Schuyler on the first run, and for Connolly on the second run. Schuyler testifies, that they told him they would take out a license in his name and become bondsmen themselves. Schuyler tes-

tifies that this was done; and the record shows that Schuyler was the principal in the bond, and that Blaisdell and Eckel were the sureties. Connolly testifies to substantially the same thing in regard to the second run. Schuyler testifies, also, that he had no interest whatever in the distillery, except his wages, of $3,000 a year from Blaisdell and Eckel, and a promise of $500 a year more from Eckel, individually. That was during the first run. Schuyler testifies that he had no interest in the manufacture or the sale of the spirits distilled, and that Blaisdell and Eckel received the proceeds of sales. Connolly testifies that he had no interest in the establishment, save his weekly wages, and that he was employed on the second run; that he was spoken to first by Blaisdell, and then had a conversation with Eckel at his hotel about wages, and refused his offer of $35 a week, and finally agreed with Green for $50; and that he went there under that arrangement. On this question of interest, you will also recollect what Blaisdell said to Marshal Murray. The interest of the defendants in this distillery, as furnishing a motive to them to remove whiskey from it illicitly, is, therefore, to be taken into consideration by you, as you shall, from the evidence believe that interest to be.

[I shall next call your attention, gentlemen, to the testimony of the witnesses, twelve in number, from inside of this establishment, to whom I have already referred, for the purpose, in view of the mass of testimony that has been taken, of leading your minds distinctly to what that testimony is.

[The first witness is Patrick Campbell, the millwright. He testifies, that he was hired by Blaisdell and Eckel; that he saw Diezendorf open the door of the cistern-room on an occasion when Blaisdell and Eckel were both of them there, during the first run, about a week after the distillery first started, in August, 1867; that he saw the hose running through the floor, through the trap, out of the window and across the yard towards the rectifying house; that. on another occasion, in August, on a Sunday, he saw Blaisdell open the cistern-room door with a key; that, on another occasion, while Eckel was there, he saw Blaisdell, in September, open the cistern-room door with a key; that at that time he saw the hose screwed upon the pipe, after it had been put through the floor; that the pipe in the yard had then been laid, and the hose was screwed on the nozzle of the hydrant; and that, three or four nights before the seizure of the establishment on the 3d of November, he saw Diezendorf open the door of the cistern-room while Blaisdell was there, and it was open the greater part of the night. That is, in substance, his testimony in regard to the first run. In regard to the second run. he says that in April he saw McClaren open the cistern-room door with a key. Blaisdell being present; that he saw McClaren screw the hose

on the tap in the cistern-room; that it was on about four hours, and the other end of it was attached to the pipe in the yard; that he saw the cistern-room door opened twice in May in the night; that on the first occasion McClaren opened it and attached the hose to the cistern; that the other end of the hose was fixed to the pipe in the yard; and that the cistern-room door was open the most of the night. He also says, that always when he saw the cistern-room open in this way at night, the distillery was in operation. He says that the second time in May that he saw the cistern-room door open at night, was two or three days before the May seizure, and that then McClaren opened it with a key.

[The next witness is John Nunan, the carpenter. He says that he saw the cistern-room door open about a week after they started, in August, 1867; that Diezendorf opened it, Blaisdell and Eckel being present; that that time it was opened not with a key, but by the staple being drawn; that the hose was attached to the tap and put down through the trap-door in the floor; that he himself cut that trap near the cistern-room door, by the direction of Blaisdell and Eckel; that they told him to cut a hole and fit a piece in so that it would not be noticed; that the next time he saw the door open Blaisdell opened it with a key, Eckel being present; that this was at night; that Blaisdell himself carried the hose into the room and attached it to the tap; that he saw the door open on Sunday, the 5th of April, during the second run, when Blaisdell, Eckel and McClaren were all of them there; and that McClaren at that time opened it with a key and attached the hose to the cistern.

[The next witness is Hugh Carr, the cartman and watchman, who was first an outside watchman, and then an inside watchman. He states that McClaren came there about a week before the first seizure. On that subject I may as well here remark, that all the testimony in the case shows conclusively. I think, that McClaren was not at all in or about these premises until about a week before the first seizure. The exact time is not specified, but it was about a week. He afterwards makes his appearance during the second run as a foreman or superintendent of the establishment. Carr says that he saw the cistern-room open three or four times before the first seizure; that on one Sunday evening before the first seizure, at Blaisdell's house, Blaisdell asked him to go on the night watch inside and mind the hose; that on another night he saw Blaisdell open the door of the cistern-room with a key and put the hose on the tap at the cistern; that that was an occasion on which Blaisdell and the witness were alone; that the hose was then attached to the pipe in the yard; that he, the witness, then went with Blaisdell to the rectifying house; that Blaisdell opened the door of the rectifying

house with a key, and he, Carr, went in and filled four or five barrels with whiskey that came from the distillery through the hose and the pipe; that Blaisdell remained a little while and then went away, and he, Carr, stayed behind; that Blaisdell told him, on one occasion, to keep an eye out especially for revenue officers; that while he was on the outside watch he saw the hose in position attached to the hydrant, and saw whiskey running in the rectifying place; that he has seen the tap turned on the cistern in the receiving room when the hose was on, and has then gone to rectifying house and put his hand under something that was running into the tubs there, and tasted it, and found it to be high wines or whiskey; that, in his capacity as cartman, he has carried whiskey on his cart from the rectifying house and the distillery, and that he never saw any whiskey go into the rectifying house except from the distillery; that, on the night of the first seizure, the hose was attached to the hydrant in the yard, at the time he heard that Mr. Bailey's men were coming; that he then went to the receiving room where the hose was attached, got the door open, turned off the tap, cut the hose there, and then ran down stairs and cut the hose at the hydrant in the yard and threw the hose into a hogshead of water in the wagon house; and that after he cut the hose in the cistern-room, he took the lock, which was upon a beam near by, shut the cistern-room door, and made an attempt to lock it, but there was another man there who hit the lock and spoiled the spring, so that the upper catch would not lie down. Upon the subject of this lock and of the hose found in the hogshead of water, you will compare the testimony of Barrows, as to finding the lock there in a certain condition, and as to finding a hose smelling of whiskey in a hogshead in the stable, with this testimony of Carr. In regard to the second run, Carr states, that during the last week of the second run he saw McClaren open the door of the cistern-room, and saw the hose put on; and that, during the last week of that run, he saw the cistern-room door open on three or four nights.

[The next witness is William Farmer. He worked there solely during the second run, from some time in April until the 16th of May. He says that he assisted Diezendorf, in the rectifying house, in receiving whiskey from the distillery, which ran through the pipe across the yard and then into the leach-tubs in the rectifying house; that there was a hose attached to what he calls a hydrant, in the centre of the floor of the rectifying house, in the basement; that he saw this operation going on a night or two after he went to work there in April; that, on one occasion, in the beginning of May, he saw the cistern-room door open; that at that time he saw Yates, Carr, Nunan and McClaren there; that he has seen the hose attached in the rectifying house several times, and high wines running; that he has seen the hose running from the cistern-room through the floor to the pipe in the yard of the distillery; that he himself has screwed it on to a gooseneck on the hydrant in the yard; and that, after such attachment was made, he has gone into the rectifying house and seen high wines coming into the rectifying house through the pipe. He also states the fact that McClaren was employed there as foreman or superintendent.

[The fifth witness is Walter Squires, the engineer. He was there during the first run. He saw the cistern-room open a week after they began to run. The hose was on and was carried across the yard. He saw the cistern-room open at night, and the hose thus arranged, several times when the still was running, and he also saw the hose, when it was attached to the receiving cistern, connected with the hydrant in the yard, after the pipe was laid.

[The sixth witness is Henry Fleisner, who was the masher and cooler. During the first run, he saw Diezendorf open the cistern-room door, on one occasion, when Blaisdell and Eckel were present. He then saw Diezendorf put on the hose, which went through the hole, and was then carried to the yard and over to the rectifying house. He says, that the tap was then opened, by turning the cock, to run whiskey; that this arrangement, when it was on at night, was generally on from ten or eleven o'clock at night to five or six o'clock in the morning; that, after this hose was taken off, there was whiskey in it; that he tasted it on one occasion; that there was nothing in the cistern-room but whiskey; that the cistern-room was so open very frequently; that he saw it so open the night before the first seizure; that at the commencement of this business Blaisdell and Eckel were there every night, but later they were not; and that he has seen Blaisdell and Eckel there when Diezendorf made the attachment of the hose to the receiving cistern.

[The seventh witness is Warren Moore, who was a fireman there. He was there the night of the first seizure. He says that the distillery was running when the officers came; that the hose from the cistern-room was attached that night to the gooseneck in the yard; that he saw it on himself; that on the second run he saw the same arrangement on two or three times a week; that the first time, on the second run, that he saw this arrangement on, McClaren was there; that he saw it on two nights before the last seizure; that McClaren was there then and Carr; and that he saw the attachment that night in the yard at the hydrant, and tasted the whiskey that night where it leaked at the gooseneck.

[The eighth witness is Moses J. Decker, the night watchman. He was there the night of the first seizure, and saw the cis-

tern-room door open, as he went up stairs to notify Lippe that some one was seeking admittance. He says that Blaisdell was there that night a short time in the evening, and left between eight and nine o'clock; and that the distillery was running when the officers come.

[The ninth witness is Ludwig Klein, a workman there. He says that he has seen the cistern room open at night; that he saw it open first at night three or four days after the distillery first started on the first run; that he saw Diezendorf open it; that Blaisdell and Eckel were present; that he saw Diezendorf put on the hose; that he saw the other end of the hose; and that it went to the rectifying house; that, during the first run, he saw Blaisdell open the cistern room door three times with a key; that the last time was about eight days before the first seizure, and about nine o'clock at night; and that, on one occasion, he tasted the whiskey in the hose a very few minutes after it had been taken off from the attachment. He was not at the distillery during the second run. He says that, in addition to the three times when he saw Blaisdell open the door with a key during the first run he saw Blaisdell present several times when the cistern room door was open at night during the first run, on occasions when Blaisdell himself did not open the door; and that he has seen Eckel there when the cistern room door was open after eight o'clock at night, and Blaisdell after nine o'clock.

[The tenth witness is Isaac S. Schuyler. He says that during the first run, Blaisdell used to tell him, almost every morning, about his running off whiskey at night, and took him, Schuyler, to task for not staying and doing it himself, alleging that it was part of his business. This was all during the first run, for Schuyler had nothing to do with the place during the second run. He says that Blaisdell told him, at one time, that the process by the hose over the surface of the ground was not quick enough, that it leaked, and that he was going to have a pipe laid in the yard, and that two or three days after that the pipe was laid. He says that he has been in the rectifying place at night, and seen the tubs empty, and has gone in there in the morning and seen them two-thirds full, and this more than once. He then states that he procured, by Eckel's direction, the hose which has been referred to; that Eckel told him to get a hose that would fit all the cocks, and could be connected in one line; and that he did get such a hose in lengths of twenty-five feet each. He also described the pipe, and the goose-neck.

[The eleventh witness is James F. Diezendorf. It appears that he had been in the drug business with Blaisdell before this distillery was started, that neither of them had ever been in the spirit business in any way, and that the way in which Diezendorf came

to go into this business and to be placed in charge of the rectifying house was from his previous acquaintance with Blaisdell. He says that he had no interest in either of the establishments or in the whiskey; that he was a hired man at $50 a week; that Blaisdell and Eckel paid the special tax for him as a rectifier; that the receipt therefor was brought to him by them, or one of them, and that he was put in charge of the rectifying place under them. It appears that from the time the establishment was started on the second run until it was closed up was about four weeks. How much of those four weeks it ran does not distinctly appear. Diezendorf states that during that period, so far as he is aware of—and he was in charge of the rectifying place—no spirits whatever were received there from any source, except what came from the distillery. Hall, the clerk in the office of the collector of the Ninth district, says that during that time the whole return of spirits from the distillery was 3,380 gallons, less than its capacity for one day, as testified to by Wheaton. Diezendorf also states that sometimes they received whiskey in this way every night—sometimes one or two times a week, and sometimes not for a week, during the second run; that the hose was screwed on the cistern and then laid under the floor and then attached to the hydrant in the yard; that then the spirits ran through the pipe to the rectifying house and came out against the upright post and were carried thence through a hose to the leach-tubs; that spirits were taken away from the rectifying house during April and May, and that he himself did not receive any of the money for those spirits. He also mentions the fact that the distillery was on higher ground than the rectifying house, so as to allow of the passage of whiskey, by gravity, from the former to the latter. He says that in April and May McClaren was there when spirits were received in this way; that he himself saw the cistern-room opened once or twice in April and May by McClaren with a key, and that that key was a key which Blaisdell had given to him, the witness.

[The twelfth and last of the witnesses from inside of the establishment is Michael J. Connolly. He was the nominal distiller during the second run, and states how he came to go there. He says that before he went to work, in April, Blaisdell on one occasion told him that he, Blaisdell, intended to get the distillery out of trouble soon, and promised him, Connolly, employment as a bookkeeper in the distillery when it should be got out of trouble; that he had two or three interviews with Eckel in regard to wages, and finally agreed with Green for $50 a week; that Blaisdell and Eckel went with him to the assessor's office to take out the license for the distillery in his name; that he, Connolly, became principal in the bond, and Blaisdell and Eckel the sureties; that he

had no interest in the distillery except his wages, and remained there four or five weeks, probably from the time they started until the place was seized; and that in April, on one occasion, in the night time, he saw the cistern room opened by McClaren with a key, and saw McClaren attach the hose to the faucet on the cistern. He also testifies as to the cordon of whisky police which was established around the block on which the distillery was situated, and says that on one night Blaisdell watched an hour with him for the revenue officers, and that this watching was kept up for several nights when it was supposed there were revenue officers about.][2]

This testimony is attacked on the part of the defence. The defence has consisted almost entirely of evidence in regard to former affidavits and statements made by more or less in number of these twelve witnesses. Some of the witnesses have been attacked with great vehemence with regard to their former affidavits and statements. There are some of them who are not attacked specifically, but only generally. These twelve witnesses were undoubtedly, to a greater or less extent, accomplices in this removal of whiskey in this way, if you shall believe that it was so removed. The evidence of accomplices is always to be closely scrutinized by a jury. It is to be looked into closely and examined carefully. A jury is always told that it is never safe to convict upon the uncorroborated evidence of a single accomplice. That is a correct and safe rule. But the rule loses its force very much when the number of witnesses is very large and they all testify to the same state of facts, under circumstances where the jury can see that they must have had an opportunity for observing what they testify to, and particularly when some of the material circumstances in the case are corroborated by the unimpeachable testimony of persons not concerned as accomplices. In this case, the instruction which I am desired by the defence to give is not correct—namely, that the testimony of these twelve persons, who appear to be accomplices, is unworthy of belief unless it is corroborated. But the jury should scrutinize such testimony carefully, and should reject such of it as they do not believe to be entirely founded upon the truth of the facts in the case. Former statements and affidavits made by any of these witnesses, to the contrary of what they have testified here on the stand, are to be looked at by the jury solely in this point of view—"What is the truth?" If, as between the former statements and the present testimony, the jury believe, upon the whole, that the one or the other is the truth, they are to act accordingly. If they believe that the former testimony was the truth, then they are not to believe the present testimony, if the two con-

flict. But if, as between the two, upon the whole case, they believe that the former statement or testimony was not true, and that the present testimony is true, then they are to believe the present testimony. It is in that point of view alone—for the purpose of arriving at what is true, that the jury are to take into consideration the former statements and affidavits; and if, in regard to any witness, they find, upon weighing the former statement or affidavit against the present testimony, that the present testimony is true, then, having arrived at that conclusion, they are to throw out entirely the former statement and the former affidavit. Because the two contradict each other, it does not follow that the jury are to reject both of them. The sole object of putting in a former statement or a former affidavit is to arrive at the truth; and when the jury arrive at what they believe to be the truth on a given point, on which there is a contradiction of that kind, they are to act upon such truth. I make this remark because I am asked by the defence to charge you that the testimony of witnesses who have given testimony on the same matter should be rejected, if it is contradictory, in material matters, to itself. That is not true, either in regard to contradictions in the testimony given by a witness here on the stand, or in regard to contradictions between his testimony and a former statement made by him. You are to weigh the fact of contradiction; and, in thus weighing the testimony of a given witness, you are to take into consideration contradictions of all kinds made by him. After such investigation, after you have ascertained from the evidence what is the truth, if you find that any witness has wilfully and deliberately told a falsehood here upon the stand as to a material fact, you have the right to believe that he is not worthy of credit in any particular.

Having thus gone over the evidence, and the principles of law which govern its application, I shall call your attention to the statute on which the indictment is founded; and you will, from the review which I have made of the evidence, be the better able to apply it to the statute. The two classes of offences counted on in the indictment are embraced in the 45th section of the act of July 13th, 1866. The one offence is, removing distilled spirits from the place where the same are distilled, otherwise than into a bonded warehouse, as provided by law. The other offence is, aiding and abetting in the removal of distilled spirits from a distillery otherwise than to a bonded warehouse, as provided by law. The former provision uses the expression, removing "any distilled spirits from the place where the same are distilled," while the latter provision uses the expression, removing "distilled spirits from any distillery." So far as this case is concerned, the place where spirits are distilled is the distillery, not the tail of the worm, or the still

itself, but the distillery premises; and, therefore, the removal which, for the purposes of this case, is made a crime by the statute, is the removal of spirits from the distillery building otherwise than into a bonded warehouse.

A distinction is made by the statute between the two classes of offences—removing, and aiding or abetting in removing. The punishment of them is different. The removal of spirits is made a higher offence, if we may judge from the punishment bestowed upon it, than the aiding or abetting in their removal;. and it is true, as I am requested to charge by the defence, that you cannot find the defendants guilty as principals, and, also, as aiders and abettors in the same offence. You cannot find them guilty of removing spirits, and of aiding and abetting in the removal of spirits, at the same instant. That is, if Blaisdell goes to the cistern-room, opens the door with a key, and attaches the hose, and the tap is opened and the spirits run through to the rectifying house, he cannot, for that act, be convicted both of removing the spirits and of aiding and abetting in their removal. He cannot, for the one act, be convicted of the two offences, so as to accumulate upon him, for that one act, the two punishments; and so, with regard to any other one of the defendants. Therefore, if, under the instructions which I shall give to you in a moment, you shall find that, on a particular occasion, Blaisdell, or Eckel, or McClaren, was guilty, by a certain act done on a certain night, of removing spirits, he is not guilty of aiding and abetting also, by that same act, although he may be found guilty of aiding and abetting by a different act on the same or some other night. As I stated before, there is one count for removal during the first run, and two counts for removal during the second run. There are but three removals of spirits counted on in the indictment. You can find each of the defendants guilty of but one removal of spirits during the first run; and, if you find that each of the defendants, on any occasion during the first run, was guilty of the removal of spirits, with intent to defraud the United States, then they are liable to conviction on the first count, and you will find such of them guilty on the first count as you find to have been engaged in such removal. But they cannot be convicted, any one of them, of more than one removal during the first run. In like manner, each of them may be convicted of two removals during the second run; and each of them may be convicted of two aidings and abettings in removal during the first run, and of one aiding and abetting in removal during the second run, provided always that you bear in mind what I just now stated to you, that you cannot convict them, for the same specific act on the same night, of a removal, and also of aiding and abetting in a removal.

I will now proceed to instruct you as to what is, under this statute, a removal of spirits, and what is an aiding in the removal of spirits, and what is an abetting in the removal of spirits. If you shall believe, from the evidence, that any one of these defendants, who had an interest in this establishment, and in the profits of working it, directed, prescribed, ordered, or set on foot the removal of spirits in the way described, then he may be convicted of such removal, even though he was not personally present; and, if any one of them, whether he had a personal interest in the spirits or not, was personally concerned in handling, on any occasion, the means of removing the spirits—if he opened the door with the key, or if he handled the hose, or if he screwed on the hose, and that was followed by the transportation of spirits by those means to the rectifying house, then he is guilty of removing spirits, and not merely of aiding and abetting in their removal. Any other help or assistance, other than what I have stated to be a removal, is an aiding in a removal; and giving any encouragement or instigation to commit a removal, other than what I have defined to be a removal, or an aiding in a removal, is an abetting in a removal.

The first count being for a removal during the first run, and the fifth and sixth counts being each of them for a separate removal during the second run, if, under the instructions which I have given you in regard to what is a removal, you find that each of the defendants was engaged in removing whiskey once during the first run, you are authorized to convict each of them under the first count. If you find that each of them was engaged twice in removing whiskey during the second run, you are authorized to convict each of them of two removals during the second run, one under the fifth count and one under the sixth count. If you find that each of them committed the offence of removal but once during the second run, they can be convicted on only one of the counts for a removal during the second run, and must be acquitted on the other. So, also, you may find any one or two of them, and not all, guilty of a removal on the one occasion during the first run, or on the two occasions, or either one of the two occasions, during the second run. For instance, you may find Blaisdell and Eckel guilty on any count, and McClaren not guilty on the same count. It is not necessary that the defendants should be jointly guilty of any one act. The indictment is not for a conspiracy. Although they are indicted together, the offences are distributive, and each defendant is responsible before you only for his own participation and his own act. Thus, you may convict Blaisdell alone, or Blaisdell and Eckel, of removing spirits on the first count, and acquit McClaren on that count, upon the evidence, as you shall find it to be; and the same view applies to the counts respecting aiding and abetting. On that subject I would call your attention again to the

fact, that McClaren did not make his appearance at the establishment, so far as the evidence shows, until about a week before the first seizure; and my recollection of the testimony to connect McClaren with anything done there during the last week of the first run, is, that it is of a very slight character, and perhaps not sufficient to warrant a jury in finding him guilty of anything charged in the indictment during the first run.

You will also bear in mind this principle, which applies to all criminal cases—that if you have any reasonable doubt, founded upon the evidence, of the guilt of any one of the defendants, under any one of the counts, you will give to him the benefit of that doubt. You will not decide the question upon a preponderance of evidence as being more against him than for him; but if you have a reasonable doubt, founded upon the testimony—not a caprice, or a notion, or a theory—you will give to the defendant in regard to whom it exists, in reference to any specific offence or offences charged in any of the counts, the benefit of that doubt, and the benefit of an acquittal.

I now commit this important case to your consideration. You will not convict any one of these defendants because others as guilty or more guilty have not been prosecuted and convicted, nor will you acquit them because others as guilty or more guilty have escaped punishment. These are considerations with which the court and the jury have nothing to do. Nor have you anything to do with the consequences which may follow a conviction. The law has prescribed what those consequences shall be, and has confided to the jury solely the determination of the question, under the charge of the court, whether the defendants are or are not guilty of the offences which the law has defined. The punishment that shall be inflicted, within the discretion which the law has confided to the court, and the exercise of the pardoning power afterwards by the executive department of the government, are questions with which the jury, when they retire to consider, under their oaths, the question of the guilt or innocence of the defendants, have nothing to do.

I doubt not, gentlemen, from the patient attention you have given to this case, from the thorough manner in which it has been tried, by the examination and cross-examination of the witnesses on both sides, and by the summing up of the counsel on both sides, and from the review which the court has given to you, of the voluminous testimony, that your minds are fully impressed with all the points of the case, and that you will do justice between the United States of America and these defendants.

The jury rendered a verdict of guilty against the defendant Blaisdell, on all the counts except the third and the seventh; a verdict of guilty against the defendant Eckel, on all the counts except the third and the

seventh; and a verdict against the defendant McClaren, on the eighth count, with a recommendation to mercy.

The district attorney, S. G. Courtney, having, on the third day after the trial, moved for the judgment of the court on the defendants, Mr. Knox, of counsel for the defendants, asked for a delay of judgment, on the ground that, in consideration of disclosures which the defendants had made to the government, in regard to frauds on the revenue, in connection with distilled spirits, the pledge of the government had been given to them that they should not be prosecuted for the offences of which they had been found guilty. The district attorney opposed any delay.

BLATCHFORD, District Judge. I have listened to every thing that has been said on both sides in regard to this matter. Very much of what has been said has no relevancy whatever to the question before the court, but has reference to matters in regard to which there is evidently a very great degree of feeling between the respective counsel, and with which this court has nothing to do.

The considerations which have been presented by the counsel for the defence, I accept, upon his statement, as fully, to all intents and purposes, as they could be presented by the most solemn affidavits. I will assume that the president of the United States and the attorney-general, through parties with whom they have communicated, have promised protection, or pardon, to these defendants, to the fullest extent. But that is a matter with which this court has nothing whatever to do. Any promises or pledges of the government in that regard, if made, will undoubtedly be redeemed. It is for the executive department of the government to exercise the power of pardon, either independently, or in consequence of previous assurances to that effect. If the government, in its wisdom, acting through the president and the attorney-general, thought that this case was a case which ought not to be prosecuted, because of those assurances, they had the power, at any time, to prevent its prosecution, by directing the district attorney not to prosecute it. This court can only have communication with the executive authorities of the government, through the district attorney, as the recognized officer of the government. When there is no district attorney in commission, the government cannot prosecute in this court. It is only through the presentation to the court of the commission of the district attorney, so that the court may know who is the proper legal officer to represent the United States, that the court can have any communication with the executive department of the government. In this case, in particular, the court knows, officially, that for a time the prosecution of this case was suspended, on the motion of the district attorney, who stated that he acted by direc-

tion of the attorney-general, and that afterwards the district attorney moved that the case proceed, stating that the inhibition upon its prosecution was withdrawn, and that he was directed to prosecute the case. The court, therefore, can know nothing of the action of the executive department of the government, except through the officer who is recognized by the statute as the proper officer to communicate with the court, on the part of the United States, and to direct the prosecution of the case. If, in the prosecution of the case, the district attorney has used, as evidence, testimony that has been produced in violation of any previous pledge, or testimony that has been procured through disclosures made by these defendants in such a manner as to entitle them to the exercise of the executive clemency, the promise is one which must be redeemed by the executive department alone, and in which this court has no part whatever. This court, in the exercise of its judicial functions, can only know that an indictment was found by a grand jury, which has been fully, thoroughly, and fairly investigated by an impartial petit jury, resulting in a conviction; and it is the duty of the court to impose the sentence of the law according to the facts, as developed on the trial. One of the great features of our system of government, derived from our English ancestors, is the entire separation of the functions of the judiciary from the functions of the executive—not merely an independent judiciary, but the separation of the functions of the two departments of the government. The administration of the judicial functions of the government, under the constitution of the United States, is entirely separate from the administration of the executive functions of the government; and to call upon a court of the United States to redeem, or perform, or fulfil, in any way, in this case, pledges, even the most extensive, the most absolute, and the most thoroughly proved, on the part of the executive department of the government, is to depart entirely from the true theory and the wise practice of our system of government, and to violate the fundamental principles of the constitution of the United States. Pledges of the character of those spoken of here, and which it is alleged have been made in this case, are sometimes made by the government, and, whenever they are made, the executive officers of the United States undoubtedly redeem them; and they will redeem such as may have been made in this case, if it be proper to do so. But this court has no concern with any such stipulations.

I, therefore, see no reason why the court should not proceed to pass the sentence which follows from this conviction, leaving the responsibilities, which will then fall upon the executive departments of the government, to be discharged by those departments, according to their own judgment.

2 [THE COURT then pronounced judgment on the defendants, as follows:

[Alvah Blaisdell and John J. Eckel, you have been convicted, after a very full, thorough and fair trial, by an impartial jury, sifted by your counsel, by examination, before they were empanelled, upon testimony which the jury and the court have regarded as perfectly conclusive, of the offences for which you were indicted. You have been convicted, each of you, upon three counts, of three distinct offences—of removing distilled spirits from the place where they were distilled otherwise than into a bonded warehouse, as provided by law; and you have also, each of you, been convicted upon three counts, of three distinct offences, of aiding and abetting in the removal of distilled spirits from a distillery otherwise than into a bonded warehouse, as provided by law. The circumstances, as developed on the trial, are circumstances of very great aggravation, and of continued persistence in this illegal business. After the distillery had been seized in November, 1867, and condemned in the following February, for the illicit running off of whiskey, it was sold by the government, and you became again connected with it, more or less intimately, and you again entered upon the same course of illicitly removing spirits, although your precise relations to the establishment, in a business point of view, may not have been the same during the second run that they were during the first run. The punishment for the offences of removing, and of aiding and abetting in the removal of whiskey, under the 45th section of the act of July 13th, 1866, under which you have been indicted and convicted, is somewhat different from the punishment prescribed by the law of July 20th, 1868 [15 Stat. 125], for the same offences. In one respect, the punishment now is more severe, and in other respects it is less severe. So far as the offence of removing distilled spirits is concerned, of which you have been convicted on two counts, the punishment provided by the statute under which you have been convicted, is a fine of double the amount of the tax imposed on the distilled spirits removed, or imprisonment for not less than three months. The punishment provided for the same offence by the law of 1868, is a penalty of double the tax imposed on the spirits so removed, and a fine of not less than two hundred dollars nor more than five thousand dollars, and imprisonment for not less than three months nor more than three years. Under the present law, the limitation of the imprisonment is to not less than three months, but there is no limitation in the other direction. It is not limited to three years, as it is in the law of 1868. The punishment for the offence of aiding or abetting in the removal of spirits, by the statute under which you have been convicted, is a fine

of not less than two hundred nor more than one thousand dollars, or imprisonment for not less than three nor more than twelve months. Under the law of 1868, now in force, the punishment for aiding and abetting in the removal of spirits is precisely the same as the punishment for their removal. Taking into account the fact that, for the offence of removing spirits, the extreme punishment by the statute of 1868 is limited to three years, although there is no limitation in the act under which you have been convicted, the court regards it as a proper interpretation of the 45th section of the act of 1866, in view of the punishment imposed by the act of 1868 for the same offence, not to inflict an imprisonment now, on a conviction under the act of 1866, for a longer period than three years. But, in this case, the court feels, from the evidence in the case, and all the circumstances surrounding it, as deduced solely from that evidence, because the court can act and does act upon nothing else, that it ought to impose the extreme sentence of the law in the way of imprisonment. I shall impose that sentence under the first count of the indictment, for removing spirits from the distillery otherwise than into a bonded warehouse, and I shall suspend sentence on the other counts of the indictment on which you have been convicted, until the execution of the sentence imposed under the first count shall have been fully performed. The offence set forth in that count is a separate and distinct offence, the same as if it were found in a separate indictment. The judgment and sentence of the court upon you, Alvah Blaisdell, under the first count of the indictment, on which you have been convicted, is, that you be imprisoned for three years in the state prison at Sing Sing. The judgment and sentence of the court upon you, John J. Eckel, under the first count of the indictment, on which you have been convicted, is, that you be imprisoned for three years in the penitentiary at Albany. The court suspends judgment and sentence, in each of your cases, upon the second, fourth, fifth, sixth and eighth counts of the indictment, until after the judgment and sentence imposed under the first count shall have been fully executed.

[You, John McClaren, have been convicted, on the eighth count of the indictment, of aiding and abetting in the removal of spirits from a distillery otherwise than into a bonded warehouse, as provided by law. The punishment affixed, by the statute under which you have been convicted, to that offence, is a fine of not less than two hundred dollars nor more than one thousand dollars, or imprisonment for not less than three nor more than twelve months. If you had been convicted of that offence under the law of 1868, the punishment would have been very much more severe, because that imposes a penalty of double the tax on the spirits removed, and a fine of not less than two hundred dollars

nor more than one thousand dollars, and imprisonment for not less than three months nor more than three years. The jury have strongly recommended you to mercy, and the court recognizes the fact that you were in this matter only a subordinate and an employee of others, and were led into it by others; and, in view of the recommendation of the jury and of all the circumstances of the case, the court sentences you, upon the eighth count of the indictment, on which you have been convicted, to an imprisonment of four months.] [2]