### UNITED STATES v. STONE.

*(Circuit Court, W. D. Tennessee. June 28, 1881.)*

1. CRIMINAL LAW—WRECKS—DEPREDATIONS ON VESSELS IN DISTRESS—REV. ST. § 5358—"PLUNDER, STEAL, OR DESTROY" CONSTRUED.

Section 5358 of the Revised Statutes is a comprehensive statute, affording extraordinary protection to property within the admiralty and maritime jurisdiction of the United States, by creating and punishing a substantive and disinct offence for all acts of spoliation upon the property belonging to a vessel wrecked or in distress. It is not alone the crime of *larceny* that is punished by the statute, but any act of depredation, whether it be of the character that would be piracy if committed on the high seas, robbery, or other forcible taking, theft, trespass, malicious mischief, or any fraudulent and criminal breach of trust if committed on land of property solely under the protection of the common or statutory law of the state within which the offence is committed. And no specific intent, as in larceny, is necessary to constitute the offence. Any intent except that of restoring the goods to the vessel or owner is unlawful, under this statute, and whether conceived at the time of the taking or subsequently thereto, if carried out by a wrongful appropriation or destruction of the property, the offence is complete. Nor is it material whether the property is taken from off the wrecked vessel itself, or out of the water while floating

away, or while cast upon the shore. Nor is the value material; all property belonging to the vessel, of any value, in any situation or condition, being under the protection of the statute.

2. SAME—CONSTRUCTION OF FEDERAL STATUTES CREATING CRIMES—COMMON-LAW WORDS—" STEAL" CONSTRUED.

While it is true that when an act of congress uses a common-law term it is to be interpreted according to its common-law meaning, this must be understood of words that are plainly used in their technical sense; and if, by the context, the object of the statute, or otherwise, by the rules of construction it appears that the word is not so used, it will be given that meaning which it must have to effect the object of the statute, and will not be restricted to a technical meaning that would defeat that object. The word "steal," if used alone, might necessarily import larceny as at common law; but when used in connection with "plunder" and "destroy," as found in section 5358 of the Revised Statutes, it will not be restrained so as to define only the crime of larceny of lost goods on land as known to the common law.

3. CRIMINAL LAW—PLEADING—SEPARATION OF OFFENCES—REV. ST. § 5358.

It is not necessary, in an indictment charging the offence declared by the Revised Statutes, § 5358, to distinguish between acts supposed to be characterized as "plundering" and those supposed to be characterized as "stealing" or "destroying." It may well be charged, in the language of the statute, as a single offence, and will be supported by proof of any act that could be denominated plundering, stealing, or destroying. Nor is it necessary to distinguish between acts of depredation committed on the wreck and those on property belonging to it, but separated from it. If the indictment be so drawn, the separation may be disregarded, and a general verdict had upon the whole indictment.

4. CRIMINAL LAW—EVIDENCE—INTENT—PROVED BY PARTY HIMSELF.

The defendant, being introduced as a witness, was permitted to testify as to his intention in taking the goods. (See note.)

5. SAME—CONFESSIONS—WHEN ADMISSIBLE.

A private detective employed by the owners, underwriters, and salvage company, with authority to collect, settle for, and recover all goods lost or plundered from a wrecked vessel, and to institute all civil or criminal prosecutions necessary for that purpose, is not a person in authority so as to exclude confessions made to him, although there were promises or threats made to induce them; but, when admitted, the weight to be given to the confessions, under all the circumstances, is a question for the jury. The circumstances under which confessions will be excluded, stated.

6. SAME—FEDERAL CRIMINAL PRACTICE—PRIVATE PROSECUTOR.

Private prosecutors are unknown to the practice of the federal courts, the district attorney being alone authorized to prosecute. *Held, therefore,* that a private person cannot be in authority over the prosecution so as to exclude confessions.

Motion for New Trial.

The defendant was indicted for depredations upon property belonging to the steam-boat City of Vicksburgh, plying between St. Louis and New Orleans, which was wrecked at Ashport, Tennessee, in July 1880; this case being one of a great number for the same offence now pending in this court. The statute under which the indictments were found reads as follows, viz.:

*Revised Statutes of the United States*, § 5358: "Every person who plunders, steals, or destroys any money, goods, merchandise, or other effects from or belonging to any vessel in distress, or wrecked, lost, stranded, or cast away upon any sea, or upon any reef, shoal, bank, or rocks of the sea, or in any place within the admiralty or maritime jurisdiction of the United States; and every person who willfully obstructs the escape of any person endeavoring to save his life from such vessel, or the wreck thereof; any person who holds out or shows false lights, or extinguishes any true light, with intent to bring any vessel sailing upon the sea into danger, or distress, or shipwreck,—shall be punished by a fine of not more than $5,000, and be imprisoned at hard labor not less than ten years."

The material allegations of the indictment in this case are as follows:

That David A. Stone, at Ashport, in said county, did plunder certain goods and merchandise from the steam-boat "City of Vicksburgh,"—that is to say, two bureaus, of the value, to-wit, of $50; one sofa, of the value of, to-wit, $25; and two sets of mattress springs, to-wit, of the value of $20,—the said steam-boat then and there being in distress and wrecked upon the waters of the Mississippi river, and within the admiralty and maritime jurisdiction of the United States, while engaged in commerce and navigation on said river, to-wit, between Vicksburgh, in the state of Mississippi, and St. Louis, in Missouri, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America.

(2) And the grand jurors aforesaid, upon their oaths aforesaid, do further present that the said David A. Stone, on, to-wit, the day and year aforesaid, at said Ashport, and within the jurisdiction of this court, unlawfully, with force and arms, did steal, take, and take away certain goods and merchandise, then and there the property of some person or persons whose names are to the grand jurors aforesaid unknown, from the steam-boat City of Vicksburgh,— that is to say, two bureaus, of the value, to-wit, of $50; one sofa, to-wit, of the value of $25; and two sets of mattress springs, to-wit, of the value of $20, —the said steam-boat then and there being wrecked and in distress upon the waters of the Mississippi river, and within admiralty and maritime jurisdiction of the United States, while engaged in navigation and commerce on said river, to-wit, between Vicksburgh, in the state of Mississippi, and St. Louis, in the state of Missouri, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States.

(3) And the grand jurors aforesaid, upon their oaths aforesaid, do further present that the said David A. Stone, on, to-wit, the day and year aforesaid, at said Ashport, and within the jurisdiction of this court, unlawfully, with force and arms, did destroy certain goods and merchandise,—that is to say, one bureau, to-wit, of the value of $50,—then and there belonging to the steam-boat City of Vicksburgh, the said steam-boat then and there being wrecked and in distress upon the waters of the Mississippi river, and within the admiralty and maritime jurisdiction of the United States, while engaged in commerce and navigation on said river, to-wit, between Vicksburgh, in the state of Mississippi, and St. Louis, in the state of Missouri, contrary to the form

of the statute in such case made and provided, and against the peace and dig-- nity of the United States.

(4) And the grand jurors aforesaid, upon their oaths aforesaid, do further present, that on, to-wit, the day and year aforesaid, at said Ashport, and within the jurisdiction of this court, the said David A. Stone did unlawfully, with force and arms, steal, take, and carry away certain goods, wares, and merchandise then and there belonging to said steam-boat City of Vicksburgh, and then and there the property of some person or persons whose names are to the grand jurors aforesaid unknown,—that is to say, two bureaus, of the value of, to-wit, $50; one sofa, of the value of, to-wit, $25; and two sets of mattress springs, of the value of, to-wit, $20,—the said steamboat then and there being in distress and wrecked upon the waters of the Mississippi river, on the Tennessee shore thereof, and within the admiralty and maritime juris-- diction of the United States, while engaged in commerce and navigation on said river between Vicksburgh, in the state of Mississippi, and St. Louis, in the state of Missouri, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States.

W. W. MURRAY, U. S. Att'y for said District.

The proof of the government tended to show that the defendant, along with others, cut into the texas of the ill-fated vessel and took away the articles mentioned in the indictment. The chief witness, Bennett, a detective employed by the owners to hunt up the missing goods, testified to a confession made by the defendant to that effect. He testified that he went to see the defendant at or near his house, in company of two other men, one of whom was at the time a deputy marshal for this district; that these two men remained some 200 yards away, but in sight of witness, when he had the conversation with defendant; that at that time no process had been issued or any steps taken to institute criminal proceedings against defendant, and that he (witness) probably told defendant that he should rather go into court after having made restitution for the goods than before, but that no threats were made. On cross-examination he further tes-- tified that he was agent for the collection of goods lost and taken from the wreck, and had with him letters of authority (which he showed defendant) from the underwriters, the wrecking company, and the owners of the boat, one of which letters instructed him to institute criminal proceedings against the guilty parties in the federal courts; that the deputy marshal was employed by witness simply to aid him in recovering lost goods, etc., or their value in money, but that he (the deputy marshal) was not acting in any way in an official capacity. The witness further stated that, having taken the advice of counsel, he did not then believe any criminal proceedings could be instituted. He subsequently distributed throughout this neighborhood small

printed hand-bills of extracts from the United States Revised Statutes on the subject of admiralty offences, containing, among others, the section on which the indictment in this case is based. He was cross-examined at great length, to show that he had sought by extortion of threats and promises of exemption from prosecution, to obtain confessions and money for goods from other parties implicated. He substantially claimed he had told all parties the same as he had this defendant. Other testimony was introduced for the purpose of corroborating this confession and the witnesses who testified to it. The defendant himself testified that he made no such confessions, but told Bennett he got the goods out of the river. He said that on the night of the wreck, being informed of it, he went to the river, near which he lived, and with one Darnell and others went out in a skiff and captured some hogsheads of meat, which they divided between them; that subsequently he got some millinery goods, spices, and pepper, of no considerable value; that next day he took from the river the articles of furniture mentioned in the indictment, and others, which Darnell took for his share and that he carried them home. The bureau being without drawers and all apart from soaking, and the lounge torn and dilapidated, and being of no value to him, he carried them back and threw them into the river. He did this because they were, he thought, worthless. A few days after the goods were captured from the river, he reported to the officers in charge of the boat, and one of them came to his house and they divided the meat, the defendant, by agreement, retaining his share for saving it. The officer gave him the millinery and spices, but nothing was said about the furniture. Bennett, however, afterwards made him pay $94 for the property, and promised him that should be the last of it. He paid for the goods to Bennett because he was afraid of him, and afraid he would kill him. Being asked if he intended to *steal* this property or to destroy it, the defendant—the objection to the testimony being overruled—said he did not; that he did not know any one had any interest in it or right to it, and he did not intend to do wrong, and that as soon as he found the goods were claimed he reported them. There was conflict of proof as to the fact of his reporting this furniture. The government endeavored to show that he concealed it, and some meat not reported by him, but he insisted that while he did not at first report the furniture, the officer could have seen it at his house when he got the meat, and he subsequently did report the furniture, and what he had done with it. He stated, on the subject of the confessions, that he told Bennett what he did, and paid him for the goods on his promise that

"that should be the end of it." He was induced to make the settlement in the belief that he would have no more trouble in court or elsewhere about it. He was afraid Bennett might kill him.

The court overruled a motion to exclude the confessions; a motion to compel the district attorney to elect on which of the counts of the indictment he would try the defendant, excluding the others; and a motion to instruct the jury to find a verdict for the defendant. After argument, the court, HAMMOND, D. J., charged the jury as follows upon the construction of the statute:

" The object of this statute, and others in the same chapter, is to protect all persons and property engaged in the commerce of the United States, or within the admiralty and maritime jurisdiction of the United States, from all manner of spoliation and violence, or rapine and plunder. It is a matter peculiarly within the jurisdiction of the United States, and the necessity for such statutes is obvious. Whether such persons and property are likewise within the protection of the common or statutory laws of the several states, against the same or analogous crimes, it is not necessary to inquire; but many of the offences found in this chapter, made for the protection of vessels and property pertaining to them, are unknown to the laws of this state, or to the general common law of England or America. The offence defined in this section, like all others against the United States, is purely statutory, and we are not administering the common or state statutory law of larceny, but a statute of the United States defining the statutory crime of ' plundering, stealing, or destroying any money, goods, merchandise, or other effects from or belonging to any vessel in distress, or wrecked, lost, stranded, or cast away upon the sea, or in any other place within the admiralty and maritime jurisdiction of the United States.' There are two other offences declared in this same section, with which we now have no concern; but the one contained in words I have quoted is a single and distinct offence, with which we are now dealing in the trial of this defendant. It is not, as has been supposed in argument, and as has been probably thought by the pleader who drew this indictment, a statute defining several offences, namely: One of *plundering from* a vessel wrecked or in distress; another, of plundering goods *belonging to* a vessel so situated; another, of *stealing* goods *from* such vessel; another, of stealing goods *belonging* to her; and still others, of *destroying* goods either from or belonging to the vessel. The whole first clause of the section describes a single offence, and it might well have been so charged in the language of the statute, pure and simple; the indictment containing, of course, the necessary jurisdictional averments as to the condition and location of the vessel. We are authorized to treat the indictment as if it had been so framed, and I charge you, therefore, that if the defendant has either plundered, stolen, or destroyed the goods mentioned in this indictment from a vessel wrecked or in distress, in any place within the admiralty and maritime jurisdiction of the United States, he is guilty under this section, without reference to the separation of the allegations into the several counts as we find them in the indictment. Nor is it at all material whether the goods were taken from off the wreck itself,

from out the water, or while cast away upon the shore. From the moment of the wreck, or commencement of the distress, until restored to their rightful owner, the goods are within the protection of this statute, into whosesoever hands they come with knowledge that they belong to the wrecked or distressed vessel. Nor is the smallness of their value at all material. Whether by efflux of time, the length of distance to which they have been carried by the current or otherwise, or the conduct of the owners of the goods in abandoning them, they ever cease to be protected by this statute, we need not inquire, because, under the circumstances of their case, as shown by the proof, there was no such lapse of time, distance from the wreck, or abandonment as would protect the defendant. We are not authorized by the use of the word 'steal' in this section, nor other words used in describing this offence, to import into this statute from the common or statutory laws of England or the state the elements of the crime of larceny of goods upon land as known to those laws. No specific intent is necessary to constitute this offence, and any intent is unlawful and sufficient for the guilt of the offender, except that alone of taking the goods for the purpose of restoring them to the master or other officer of the unfortunate vessel, or to their ultimate rightful owner. If a person near the wreck does not intend to restore the goods, or intends to make any other use of them than preserving them for the master or owner of the vessel, or owner of the goods, he must let them alone or he violates this statute. Nor is the time when the unlawful intent is conceived material. If the accused takes the goods with the lawful intent to preserve and restore them, and afterwards yields to the temptation of avarice or cupidity, and converts or destroys them, he violates this statute.

"Again, the manner of taking is wholly immaterial, whether by open force or stealth, or otherwise. The words of this statute are sweeping and comprehensive. They include all unlawful taking, whether on the facts the crime at common law would be piracy, robbery, larceny simple, mixed, or compound, malicious mischief, or what not; and includes such taking as would, under statutory offences, be called embezzlement, criminal or fraudulent breach of trust. To illustrate: At common law, if you give your goods to the master of a vessel to be carried as freight, and he appropriates or converts or destroys the whole cargo or package, he is not guilty of larceny, but only a breach of trust; but if he breaks the package and takes a part, he is guilty of larceny. Now, we have no such refinement in this statute, and, if the vessel be wrecked or in distress at the time of the taking, the master would be guilty, if not of stealing, certainly of plundering, and would be caught by this statute in a crime, as he should be. This statute is not, gentlemen of the jury, a dead letter, as has been said by counsel; nor does ignorance of it at all excuse the crime. The act of taking for your own use, or to destroy or otherwise despoil the owner of goods that are wrecked, either from the wreck or afloat, is in itself morally wrong, and it must so occur to every man whose sensibilities are not blunted by avarice, and that it is against common right to do it. It may not be against common law, but every man should expect to find some law in some statute somewhere to punish it. Unfortunately, human experience teaches us that when a disaster occurs by fire, wreck, flood, or storm, and the property of the victims is left unprotected by the ordinary care and

possession of the owner, there seems to arise an irresistible temptation to appropriate it in the minds of men bent on plunder for the love of it, and often even where the man would scorn to be caught in the odious crime of *stealing* from his neighbor. They do not look upon it as stealing, and perhaps it is not; but it is plundering, and it is just that offence this statute punishes when committed of goods that are wrecked. Now, I do not hesitate to say that where a man, under the influence of excitement and sudden temptation, yields to this impulse of taking for himself what seems lost, and is not a professional wrecker and plunderer, he deserves consideration in the matter of mitigating the punishment prescribed by this statute, but it in no sense excuses the crime or authorizes acquittal at your hands. If the law imposed on you the duty of fixing the punishment, I should tell you to consider whether such mitigating circumstance existed in this case; but it does not, and you have nothing to do with it. It is a matter for the court, whose discretion is unlimited by the statute, to consider those facts, if any there be, which mitigate the punishment.

"If a vessel be wrecked, or in distress, and goods afloat, I do not say it is the duty of any one to rescue them for the owner in any other sense than it is his duty to help all who are in peril of life or property; but it is his right, and in our admiralty and maritime law the service is always rewarded by salvage. With a lawful purpose, therefore, this defendant had a right to rescue the goods, if afloat, and no presumption is against him from the mere act of taking them while so afloat. But, if you find he took them from the wreck itself, inasmuch as that was not abandoned or deserted, but under the control and in the possession of those who had the right of possession, the defendant had no right to go upon it to rescue goods, even to save them; and there would be a presumption of wrongful intent from the mere taking itself, unless it were explained to be for some rightful purpose. The lawful purpose with which he might rescue them is to keep them for restoration to the owner upon payment of his salvage dues, or, in default of agreement as to that, to libel them in the proper court by delivering them to the court for a settlement of the salvage claim. Taking them with any other intent is unlawful, and a violation of this statute. The intent must be proved by the acts of the accused; and where he is a competent witness, as here, he may, I think, speak to his intent and say for himself what it was. But if he testifies to an intent that is inconsistent with his acts, he is unworthy of belief as to that intent. He may explain his acts, and show how they are consistent with what he says his intent was, but the explanation must satisfactorily show the consistency. A man cannot appropriate the goods of another to his own use and say he intended no wrong thereby, if he knows they did not belong to him, but to a vessel wrecked or in distress. He has no fair color of right or title to goods belonging to a vessel so situated; and, if he knows them to so belong, he cannot appropriate them to his own use or destroy them without guilt under this statute, no matter what he may have thought as to his right to so appropriate them. The essential elements of the offence are:

"'(1) A vessel wrecked or in distress, and within the admiralty or maritime jurisdiction of the United States; and as to this there is no dispute. (2) Taking goods either from or belonging to this vessel with a knowledge that

they so belong, and an intent to appropriate, convert, or destroy them by some other use than that of restoring them to the vessel or the owners, entertained either at the time of the taking or subsequently formed and carried out by such unlawful use.'

"If, therefore, you find from the proof that the defendant took the goods mentioned from the City of Vicksburgh, either from off the wreck itself, or while afloat or cast away upon the shore, with an intent to appropriate or destroy them, and that he did so appropriate or destroy them, he is guilty under this statute, and you cannot avoid saying so. If, however, you believe that he took the goods with an intent to preserve them and restore them to the owner, either without salvage for saving them or with it, he is not guilty. If his intention was to claim salvage, he might lawfully keep the goods until that claim was adjusted by agreement or decree of court, but no other intent than this could be lawful under this statute."

The court gave the following instruction asked by the government:

"The district attorney, on behalf of the United States, asks the court to instruct the jury that, under the *third count* of the indictment herein, if they believe from the testimony that the defendant threw into the Mississippi river the goods named in this count, and that they belonged to the steam-boat City of Vicksburgh, he is guilty of a destruction of such goods."

And also the following asked by the defendant:

"If the jury believe that the defendant rescued the property in question from the river, and afterwards, believing or supposing that said property was not worth preservation, threw it again into the river for the sole reason that he thought it not worth preservation, and not for the purpose of depriving the owners of it, then you will not be authorized to convict him of this offence because of throwing them into the river."

"If the proof shows that the defendant took goods belonging to the steamer Vicksburgh which had floated from the wreck, the court charges the jury that such taking was *prima facie* lawful; that every person has a legal right to save goods which belong to a wreck, and are derelict; and, when he does take goods under such circumstances, no presumption of guilt can arise from such taking *per se;* on the contrary, without more, the fair presumption is that the taking was with a proper motive."

The court read to the jury a charge asked by the defendant on the subject of confessions as the law on that subject, taken in connection with what the court said to them on the same subject. The defendant's request is as follows:

"A confession of the defendant has been detailed by the witness Bennett, in which he admits going upon said steamer after her wreck, and taking the articles mentioned in the indictment from her texas. The court charges you with reference to verbal confessions—and the one detailed by Bennett is of this character—that they are regarded with suspicion by the law: *First*, because of the liability the person repeating them is under to mistake the party confessing as to what he actually did say, or to repeat accurately what he

did say; *secondly*, because a person charged with a criminal offence is in such a state of mind as very often not to express his meaning with accuracy, and may be induced by reason of his distressing surroundings to confess guilt, when, in point of fact, no guilt exists. Again, the instruments of evidence may be corrupted; that is, the person making the alleged confession, by reason of his occupation or interest in the particular trial, his zeal in procuring evidence, may exaggerate what defendant did say, and give it a color and meaning which he never intended. This being so, the law regards it as impolitic and unjust to allow any defendant to be convicted of any crime upon his bare and unsupported confession of guilt, however plain and unequivocal it may be, and requires, in addition to such confession, some evidence independent of such confession which clearly shows that the crime charged in the indictment against the defendant has been committed. And in this case if the only proof showing that the defendant took the two bureaus, sofa, and mattress springs, charged in the indictment, from the steamer Vicksburgh, as above explained to you, is his confession, then you must acquit him."

The court added this:

"If a confession be given under the duress of one in authority, either through promises or threats, it cannot be admitted at all; but this is a question for the court, and I have admitted the testimony of Bennett because he was not in authority. But, even when thus admitted, the weight of it is a question for you to determine. If given voluntarily, and without compulsion of threats or hope of profit, it is entitled to much weight, and should be satisfactory proof of guilt if corroborated by the other proof of facts and circumstances in the case. The real question is whether there has been any threat or promise of such a nature that the accused would be likely to tell an untruth from fear of the threat, or hope of profit from the promise. Steph. Dig. "Evidence," 73, note. If, therefore, in looking to the circumstances, you find no other proof of guilt except the bare confession, given under threats or promises of such a nature as to induce the defendant to falsely confess his guilt, you must acquit him. But if, taking the confession itself as detailed by Bennett, together with all the other proof in the case, you find facts and circumstances tending to prove its truth, you may look to it all and say whether he be guilty or not of the offence, as I have described it to you in that part of this charge construing the statute."

The court refused the following instruction asked by the government:

" That, under the *fourth count* of this indictment, if they believe from the testimony that the defendant took the goods named in this count, or any of them, from the Mississippi river, (and that they belonged to the said steamboat,) 'with the motive of gain or advantage to himself,' (*lucri causa*,) and if he knew at the time that they belonged to said steam-boat, or, under the circumstances, could have reasonably ascertained this, and then fraudulently converted the goods to his own use or destroyed them, this is sufficient evidence to justify the jury in finding the felonious intent constituting larceny. If the defendant, under the proof, took the goods from the river, removed

v.8,no.4—16

them to his home, and made a division with his associates, this, as a matter of law, raises a presumption against him of fraudulent intent in the taking."

And also refused the following asked by the defendant:

"(1) Larceny is the felonious taking and carrying away the personal goods or chattels of another. In order to constitute this offence there must first be a *taking from the possession*, either actual or constructive, of the owner; and such taking must be felonious—that is, with the *specific* intent on the part of the taker to deprive the true owner thereof. Furthermore, before the taking as above defined can be regarded as felonious, it must be without color of right or claim on the part of the taker.

"(2) If a man takes the goods of another under the honest belief, however ill founded, that he has a right to do so, he is not guilty of larceny or stealing, and cannot be convicted, under this statute, of stealing, by reason of such taking.

"(3) As a rule every man is conclusively presumed to know the law, and cannot excuse his unlawful act because he was ignorant it was unlawful; but this general rule has many exceptions. Among these exceptions is the case where a man takes goods under a misapprehension of his legal rights, and he cannot be convicted of stealing them. In such case there is the absence of specific intent to steal, which is an indispensable element of larceny.

" (5) If the jury find that defendant took goods in the river floating from the wreck, as stated in the above charge, with lawful intent, and subsequently determined to appropriate said goods to his own use, and did so, nevertheless he cannot be convicted under this indictment of the offence of stealing goods belonging to the steamer Vicksburgh. In other words, the taking of the property and the intent to steal it must be cotemporaneous, one with the other.

"(6) The court further charges you that if the articles which the defendant is charged in the indictment with stealing were taken by him whilst they were floating in the water, at the time when they had escaped from the custody and control of the crew of said steamer, then the defendant cannot be convicted of stealing goods belonging to the said steamer, as is charged in the fourth count of the indictment, unless you find that at the time of such taking that he knew such goods belonged to said steamer, and at the time of such taking intended to steal them.

"(7) In order to find the defendant guilty on the first and second counts of this indictment, which respectively charge the defendant with plundering and stealing the articles mentioned in said counts from the steamer Vicksburgh, before you can convict him you must find, beyond a reasonable doubt, that said articles were taken from some part of said steamer. If they were floating in the water, separate from the wreck, they were not taken from the steamer, and the defendant must be acquitted of the charge contained in the first and second counts.

"(8) The court charges you that when you come to consider of your verdict it is your duty to take up in their order each of the counts contained in the indictment. If you find him not guilty of the first count, you should then consider whether he be guilty on the second count, and so on with each succeeding count to the end. If you find him guilty on any count, you should state in your verdict under what count you so find him guilty.

"(10) In considering the confession testified to by Bennett, you should consider every part of it together, and should not arbitrarily accept as true one part and discard as false another. And, if such confession relates alone to goods taken from the texas of the steamer Vicksburgh, it can only be considered with reference to those counts which charge plundering and stealing *from the vessel*, and it would not have a tendency to show that he was guilty of stealing or plundering goods belonging to the Vicksburgh, but which were not upon the boat, and such confession should not be considered under the counts charging a plundering or stealing of goods belonging to said steamer.

"(11) If under the proof it appears to you that the defendant, in company with Darnell, Rainey, and Westmoreland, went upon the river and caught goods floating from the wreck, and afterwards divided them among themselves in good faith, supposing they had a right so to do, and the defendant, within a reasonable time thereafter, reported to the agent or representative of the owners of the goods his having in his possession the goods retained by him as his share, then no conclusion unfavorable to him can be drawn either from the fact of such division having been made, or from his failure to report the goods falling to the share of Rainey, Darnell, and Westmoreland."

*W. W. Murray*, Dist. Att'y, and *John B. Clough*, Asst. Dist. Att'y, for the United States.

*Metcalf & Walker* and *Luke E. Wright*, for defendant.

HAMMOND, D. J. The court is satisfied that the construction put upon the Revised Statutes (section 5358) is the correct one. I cannot consent to emasculate this statute by whittling it down by construction to the paltry proportions of larceny of lost goods on land, as understood at common law; and certainly not to the once still narrower doctrine of our state that there can be no larceny of lost property, which has everywhere been repudiated as unsound, and is now changed by statute. T. & S. (Tenn.) Code, 4685; 2 King Dig. (2d Ed.) tit. "Larceny," §§ 1986, 1992; 2 Ben. & Heard, Lead. Crim. Cas. (2d Ed.) 409, 426; 1 Crim. Law Mag. 209, 214; 2 Whart. Crim. Law, (7th Ed.) §§ 1791 *et seq.;* Id. § 1867; 2 Bish. Crim. Law, (6th Ed.) § 758, note; par. 17, § 838; § 880 *et seq.* I am of opinion, therefore, that the instructions asked by the defendant, defining larceny and the specific intent necessary to constitute that crime, and applying it to goods "floating in the water, at the time when they had escaped from the custody and control of the crew of the steamer," were properly refused.

In the first place, goods so situated are neither lost nor abandoned, in the circumstances of this case, while floating near a recent wreck to which they belong, with full knowledge on the part of those who take them that they do so belong. Even in the eyes of the common law they are not lost, but certainly not in those of the maritime law.

2 Pars. Ship. & Adm. 288, 292; 1 Abb. Dict. word "Derelict." And, if they can ever belong to the first finder, it is only when they are both derelict and abandoned. *Weyman* v. *Hurlbut*, 12 Ohio, 81. Wreck is not properly so called if the real owner is known, and is not forfeited till a year and a day. Id.; *Reg.* v. *Thurborn*, 1 Den. 387; 2 Ben. & Heard, Lead. Crim. Cas. 409, 411. The floating goods are still in the constructive possession of the owner or the vessel, more like those in a house on fire, and are not abandoned because in peril. If one remove them for preservation, intending to keep them for the owner, but afterwards secrete and appropriate them, there is no larceny at common law, but only a breach of trust. *Rex* v. *Leigh*, 2 East, P. C. 694; 2 Bish. Crim. Law, § 837; 2 Ben. & Heard, Lead. Crim. Cas. 426. If, however, the intent at the time of taking had been to appropriate the goods to her own use, the judgment in that case would have been different, nor would the defendant have been excused upon any theory that she entertained a *bona fide* belief that when a house was on fire the goods in it or taken from it belong to any one who secured possession of them, or that she did not think it stealing and did not intend to steal, but only to take what she supposed she might rightfully take. That would have been trying the act of the accused by her own mental characterization of that act. On that theory, if one takes money from under a pillow at night, and by stealth, he might have his crime excused by showing by his own testimony or otherwise his state of mind on the subject, and that he entertained an honest belief that he could do that thing without any wrong to the owner. This seems to me the result of the argument made for the defendant here, when we are asked to hold that, if he believed that he had a right to take these goods for his own use, he is not guilty.

That there is a prevalent belief along this river that goods floating from a wreck may be appropriated by those who "capture" them from the water is, perhaps, true; and it may be that goods so situated are supposed to belong to the first taker by those who know better than to apply the same rule of conduct to goods lost or in peril by fire or other disaster on land. But it seems to me plain that this preposterous claim of right cannot serve to excuse the taking either at common law or under the statute. I do not see how any man whose moral sensibilities are not blunted by the temptation always afforded by such disasters, whether on land or sea, and who is not wholly demoralized in the presence of the temptation, can fail to recognize the wrong in it. The duty of restoring the

goods is enjoined by the oldest rules of the moral law. Deut. xxii: 1–3. Every instinct of right and fair dealing suggests their return, and this statute was enacted to enforce that duty. Ignorance of a fact may sometimes be taken as evidence of a want of criminal intent, but not ignorance of the law; nor will any belief, not even a religious belief, in the right of the act excuse the crime. *Reynolds* v. *U. S.* 98 U. S. 145, 167. There is a principle, undoubtedly often misapplied, I think, in the law of larceny that excuses the taking or avoids the criminal intent where there is a fair color of claim or right to the property. For example, in the case already put, if one takes money from under a pillow at night by stealth, with the intention by that means to recover that which had been before in his belief wrongfully taken from him, there would be no larceny, although the money was not in fact the same, nor was there in truth any wrong done to him. *Merry* v. *Green*, 7 Mees. & W. 627; *State* v. *Homes*, 17 Mo. 379; *State* v. *Conway*, 18 Mo. 321; *State* v. *Deal*, 64 N. C. 272; *Herber* v. *State*, 7 Tex. 69; *Rex* v. *Hall*, 3 C. & P. 409; 1 Whart. Crim. Law, § 83; 2 Whart. Crim. Law, §§ 1770, 1785; 2 Bish. Crim. Law, § 851. This color of right, however, must come from some claim to the property itself, *de hors* this act of taking, and not, as I apprehend, be solely predicated upon an erroneous belief that what is known to belong to another may be appropriated to one's own use without his consent, or without compensation, because of the situation in which it is found. Nor will any usage or custom justify the taking. 2 Bish. Crim. Law, § 852; 1 Whart. Crim. Law, § 83*e*. Mr. Russell mentions the taking of corn by gleaning, under an erroneous notion which universally prevails among the lower classes that they have a right to glean, and differs with Woodfall on his statement that it was larceny. 2 Russ. Crimes, (8th Am. Ed.) 10. In *Com.* v. *Doane*, 1 Cush. 5, however, it was held that a custom by officers to appropriate small parts of the cargo would not establish a claim of right.

But while I am inclined to the opinion that on the facts of this case a common-law indictment for larceny, pure and simple, might be sustained, if the statute had intended only to declare that offence as applicable to wrecks, as the statute was not so interpreted and the jury was not instructed on that theory, the conviction cannot be sustained on that ground, because it was their province to determine whether the facts constituted larceny. It is, then, still necessary to inquire whether the charge has correctly interpreted the statute as one declaring an offence distinct from larceny, or rather one

broad enough to cover not only a taking by larceny, but any other wrongful taking. If we admit that the facts in this case do not constitute larceny, or that those do not which are mentioned in *State* v. *Conway, supra,* where an iron safe belonging to a wrecked vessel was taken from the river and its contents appropriated after notice of their ownership, under circumstances, said by the supreme court of Missouri, to show that the perpetrators were "unmindful of the duties of good and honest men," I am still of opinion that either case falls within this statute, because, if not stealing in the sense of the common law, it was *plundering,* as known to this statute; if not in the *Conway Case,* certainly in this, where the distressed vessel was almost in sight and the goods were confessedly known to belong to her.

Mr. Stephen says of this word "plunder" that he does not know that it has any special legal signification. Steph. Dig. Crim. Law, (St. Louis Ed. 1878,) 261, 266, and notes. The lexicographers define it as that which is taken from an enemy by force: "spoil;" "rapine;" "booty;" "pillage," etc. Worcest. Dict.; Webst. Dict. In Roget's Thesaurus it will be found grouped with "mutilation," "spoliation," "destruction," and "sack," at section 619; with "harm," "wrong," "molest," "spoil," "despoil," "lay waste," "dismantle," "demolish," "consume," "overrun," and "destroy," at section 649; with "booty," "spoil," and "prey," at section 793; and with "taking," "catching," "seizing," "carrying away," "stealing," "thieving," "depredation," "pilfering," "larceny," "robbery," "marauding," "embezzlement," "filch," "pilfer," and "purloin," at sections 791, 792, (Sears' Ed. 1866.) In Abbott's Law Dictionary "plunder" is said to be often used to express the idea of taking property without right to do so; but not as expressing the nature of the wrong involved, or necessarily imputing a felonious intent. 2 Abb. Dict. 284, word, "Plunder." In Bouvier's Law Dictionary it is limited to the idea of capturing property from a public enemy on land; but "plunderage" is defined as a maritime term for the "embezzlement" of goods on board a ship. The word is used in Rev. St. § 5361, in describing an intent as a synonym of "despoil," this being also a section of the act of 1825, from which the one we are considering was taken. The first English statute of 7 and 8 Geo. IV. c. 29, § 18, used the words "plunder or steal," but contained a proviso that where things of small value were cast on shore and were stolen, without circumstances of violence, the offender might be prosecuted for simple larceny; which shows that the statute was not regarded as declaring the crime of larceny simply, but something more. Indeed, anciently, the common law would

take no jurisdiction of theft upon the high seas, but committed the offender to answer in the admiralty. The second English statute of 1 Vict. *c.* 87, § 8, uses the words "plunder or steal," as does the latest, 24 and 25 Vict. *c.* 96, § 64, without the proviso, and, with the exception of the word "destroy," the act is the same as our act of 1825, which was enacted before any of the English statutes. 2 Russ. Crimes, 150; 3 Fish. Dig. (Jacob's Ed.) 3322; 1 Bish. Crim. Law, § 141. In *Carter* v. *Andrews*, 16 Pick. 1, in a slander case, it was said that though the word "plunder," in its ordinary meaning, imports a wrongful acquisition of property, yet it does not express the precise nature of the wrong done.

"The most common meaning," says Mr. Chief Justice Shaw, "of this term 'plunder' is to take property from persons or places by open force, as in the case of pirates or banditti. But in another and very common meaning, though perhaps in some degree figurative, according to the general tendency of men to exaggerate and apply stronger language than the case will warrant, it is used to express the idea of taking property from a person or place without just right, but not expressing the nature or quality of the wrong done. Like many such terms, as pillaging, rifling, pilfering, embezzling, swindling, peculation, and many other like ambiguous terms which have not acquired, either in law or philology, a precise or definite meaning, they express the idea of wrongful acquisition, but not the nature of the wrong done." Page 9.

The same thing may be said of the word "steal," though it is not as indefinite as "plunder." It is generally used to express the crime of larceny,—which is the purely technical word, about the meaning of which there can be no doubt,—and in a slander case it would need no *innuendo* or colloquium to give it force. Yet we often use it in a sense not synonymous with larceny, as when we speak of stealing a child, stealing a wife, stealing a thought, stealing land, stealing a literary composition, or the like. One of the definitions is "to take without right or leave." The primary idea of the word is *stealth*, or a secret, concealed, or clandestine taking; but it is quite as often applied to open taking, and is used interchangeably with "rob," which is defined "to take away" without right—*to steal;* "to take anything away from, by unlawful force or secret theft—*to plunder;* to strip." Worcest. Dict., words, "Steal," "Rob;" Webst. Dict., same words and "Purloin;" 2 Bouv. Dict., word, "Stealing;" 2 Abb. Law Dict., word, "Steal." I do not find the word "steal" used in defining larceny in any of the common-law authorities cited by Mr. Bishop, or elsewhere, from Lord Coke down. 2 Bish. Crim. Law, § 758, and notes; 1 Bish. Crim. Law, § 566; 2 Whart. Crim. Law, § 1750. And the truth is, I think, it is not a technical word, in the strict sense of that term, but a com-

mon word applied to almost any unlawful taking, without regard to exactness of use or accurate technical terminology. In *Dunnell* v. *Fiske*, 11 Metc. 551, Mr. Chief Justice Shaw says:

"The natural and most obvious import of the word 'steal' is that of felonious taking of property, or larceny; but it may be qualified by the context." Page 554.

In *Alexander* v. *State*, 12 Tex. 540, where the words of the statute were "steal or entice away a slave," it was held the word "steal" imported a simple larceny, and "entice away" defined a separate offence, distinctly differing from the other. A similar statute was not so construed in South Carolina, but as creating a statutory offense differing from larceny; and this Texas case is, I believe, exceptional. *State* v. *Gossett*, 9 Rich. (S. C.) Law, 428. In *Spencer* v. *State*, 20 Ala. 24, it appears that in the Penal Code of Alabama there were two sections, one of which, the twenty-fifth, enacted that if one should "fraudulently or feloniously *steal*" property in any other state or country, and bring it into that state, he might be convicted and punished "as if such larceny" had been committed in Alabama. Another, the eighteenth section, enacted that any one who should "inveigle, *steal*, carry, or entice away" any slave, etc., should, on conviction, be punished, etc. The words "steal" and "larceny" were held to be technically used in the twenty-fifth section, and required that the ingredients of larceny should exist; while in the eighteenth section the word "steal," with others used, embraced not only larceny, but other offences different from that offence in some essential particulars. Perhaps it would have been more accurate to say that the eighteenth section constituted a statutory offence embracing not only larceny, but other acts, essentially differing from those entering into that offence; because it is apparent from the case, and the others cited in the opinion, that is what the court meant, and not a plurality of offences, including larceny. In *Williams* v. *State*, 15 Ala. 259, the word "steal" is said to import a larceny, when technically used, but in this eighteenth section to be used as a synonym of "carry away;" for the act declares that the offence shall be complete without an intention to convert to use of the taker or some other person, which was the essential ingredient in larceny. So, in *Murray* v. *State*, 18 Ala. 727, it was held that although the acts must, under the twenty-fifth section, constitute larceny in Alabama, it was the bringing of the slave into the state that constituted the statutory offence. And see *Ham* v. *State*, 15 Ala. 188. Furthermore, it appears from these cases that under these two sections a common-law

indictment for larceny was insufficient, because it did not describe the *statutory* offence; and this, although both "steal" and "larceny" appear in a technical sense in one of the sections; for the state could not punish the crime of *larceny* committed in another state, nor was there any such crime as larceny of a *slave* at common law. The offences were *statutory,* and must be so charged; and it will be found they were, when properly indicted, charged under a pleading using the words of the statute in one count, as to which I shall have occasion to speak further hereafter. I cite the cases now to demonstrate that the word "steal" does not always nor necessarily import the crime of *larceny.* If congress had said that every person who shall *steal* goods belonging to a wreck, using no other words, I should probably hold it to denounce only acts constituting larceny at common law, in obedience to our familiar rule of construction that when congress defines a crime by only using its common-law name, we interpret it by the common law; although, considering the character of the property and the nature of the jurisdiction, as arising out of the *maritime* and *commercial* control of the United States over the subject-matter, it might well be doubted if, strictly speaking, there could be a *common-law* larceny under the circumstances mentioned in this statute, and whether the word "steal," when used in that connection, should not of itself mean more than it does at common law. Associated, as in this statute, with "plunder" and "destroy," I have no doubt it does mean a great deal more, and just what I charged the jury in this case. The Revised Statutes, in sections 5356 and 5357, taken partly from this same act of 1825, and partly from others, were dealing with larceny on the high seas, and the language used shows that if congress intended to punish only that offence in this section it would have employed the technical language for the purpose.

The word "destroy" is also somewhat a maritime word, and is used, as will be seen by other sections of this chapter of the Revised Statutes, to denote any kind of deprivation of the owner by demolishing, making way with, or other subversion of his property. Taken altogether, these three words comprehend any kind of taking with evil intent, and we have implied by them the *animo furandi* and *lucri causa* of larceny, the love of greed accompanying embezzlement, breach of trust, and such self-appropriation as escapes the punishment for larceny for want of a trespass, and the wicked intent that belongs to such acts as we call malicious mischief, criminal trespass, and the like. Any of these intents are sufficient under the statute; and, although there must necessarily be a general evil

or fraudulent intent, it is not to be confined to that specific intent which characterizes larceny. 1 Bish. Crim. Law, §§ 345, 344, 343, 207, 206, 205; 1 Whart. Crim. Law, § 297; 2 Whart. Crim. Law, §§ 1794, 1800.

It is said by a learned annotator that the finder of a lost article of goods may have three motives—(1) To keep it and use it as his own; (2) to keep it for the owner when ascertained; (3) to keep it for a reward. 2 Ben. & Heard, Lead. Crim. Cas. (2d Ed.) 431. To which may be added, in cases like this, that of depriving the owner of his property by destruction, if that can be an intent independent of that to use it as property belonging to the finder, or supposed by him to belong to himself, as in this case. I am unable to see any other motive, and the ingenuity of counsel has not satisfactorily suggested any; and I charged the jury in this case that if the second and third of these motives existed this statute was not violated, but if any other were found it was, and, it seems to me, clearly so. It was said in argument one might drag goods from the river to see if worth saving, and, on examination, supposing them worthless, immediately cast them back. I understand the authorities to hold that if kept but for a moment with the unlawful intent the crime is complete. 2 Whart. Crim. Law, § 1789. So, if in the case put the intent were to appropriate the goods to his own use, the statute would be violated; but if it were to save them for the owner it would not. However, if excused in the case suggested it would not be for want of unlawful intent, but because the act of taking had not been completed.

I consider the case of the *U. S.* v. *Pitman,* 1 Sprague, 196,—and see *The Missouri's Cargo,* Id. 260, for a fuller statement of facts,—as a direct authority, in support of the charge given to the jury. The learned counsel for the defendant, who have defended this case with a pertinacity and zeal that characterizes all they do, and a professional ability that could not be surpassed,—and I say this sincerely, and not to assuage defeat,—have gone into an elaborate argument and citation of authorities to show that the learned judge in that case uses the word "embezzlement" as the synonym of "larceny," which, it is said, was the crime committed, and also that Chancellor Kent and other judges have so used the word. I shall not stop to inquire whether Pitman could have been convicted of larceny at common law, but I doubt it. I think, however, that the court in that case did not so use the word, but rather in the sense used in the maritime law, as any fraudulent taking by the crew of parts of the cargo. 1 Bouv. Dic., word, "Embezzlement;" 1 Abb. Dict., same

word; *The Boston,* 1 Sumn. 329; *Spurr* v. *Pearson,* 1 Mason 104; *Edwards* v. *Sherman,* Gilp. 461; *The Rising Sun,* 1 Ware, 279; *Harley* v. *Gawley,* 2 Sawy. 7; *Cromwell* v. *Island City,* 1 Cliff. 221, where the word is used in the sense of "plunder." Also, that it is there used in the larger sense that we find it in our ordinary statutes against the wrongful appropriation of another's property. It is to be observed, too, that Pitman was a salvor, and the original taking was with that lawful intent, and yet he was convicted under this statute, which manifestly applies to all the cases of embezzlement and plunder by persons claiming salvage. At all events, the principle of construction adopted there applies as well to this case,· and I am content to extend it, if need be, to the facts we have here, rather than adopt the narrow construction insisted on by counsel for the defendant. Even a penal statute should not be so strictly construed as to defeat the obvious intention of the legislature. *Am. Fur Co.* v. *U. S.* 2 Pet. 358. The charge finds support, also, in the case of *U. S.* v. *Coombs,* 12 Pet. 72; *U. S.* v. *Palmer,* 3 Wh. 610; and *U. S.* v. *Pirates,* 5 Wh. 184. See, also, *The Kensington,* 1 Pet. Adm. 239; *U. S.* v. *Davis,* 5 Mason, 356, at p. 361.

The next objection taken to the charge is that the court unwarrantably amalgamated the counts in the indictment, by which the defendant was surprised and misled. It is said the court made a new indictment and departed from the pleading of the government in order to avoid trying the defendant upon an indictment for larceny. This only amounts to saying that the court refused to adopt the defendant's view of the statute restricting it to a larceny of lost goods on land, for it is almost too plain for argument that under our practice the form of the pleading is immaterial if the substance of the averments is sufficient; and it requires some injury to the defendant to enable him to take any advantage of a defect in form. Rev. St. § 1025. The indictment is misleading, no doubt, in chopping this offence, as it does, into pieces, by predicating one offence on "plunder," another on "steal," and yet another on "destroy," and subdividing these again into separate offences in relation to goods taken *from* the wreck and those *belonging to* it. The process may as well have been continued by a like separation of the words "money, goods, merchandise, or other effects;" or, still further, of the words "in distress, wrecked, lost, stranded, or cast away upon the sea, or upon any reef, shoal, bank," etc., etc. The court admits that it did not detect this defect, if it be one, until it came to consider the charge to be given, and the request of the defendant to charge the jury

to find a verdict on each separate count. The case in Sprague's Reports was passed by the court to counsel early in the proceedings, and attention called to its construction of the words "plunder" and "steal;" but the questions on the form of the indictment were not raised at the bar, nor suggested to the court, otherwise than by the requests for instructions, handed up after the argument. This will account for any surprise so far as the court may be concerned; and if the fact were that any testimony had been excluded, or ruling made, to the prejudice of the defendant, because of the failure of the court to detect this peculiarity of the indictment, and because of the supposition that we were trying separate offences under it, or any injury could have resulted, I should now grant a new trial. But it is plain to me that no harm has been done him by this mode of pleading and trial. Even if they had been separate offences—or separate indictments, for that matter—they could have been consolidated under our statutes and tried together. Rev. St. § 1024. Again, when so consolidated into one indictment, with separate counts, a general verdict is proper, and will be sustained if any of the counts be good and charge an offence. T. & S. Code, (Tenn.) § 5217; 2 King's Dig. (2d Ed.) §§ 2185, 2003, and cases cited; 1 Arch. Crim. Pl. (8th Ed.) 292, and notes; *U. S.* v. *Pirates, supra;* 5 Wh. 184; *U. S.* v. *Patterson,* 6 M. L. 466, 469; *U. S.* v. *Peterson,* 1 Wood & M. 305; *U. S.* v. *Seagrist,* 4 Blatchf. 420. This last case is a direct authority for disregarding the unnecessary separation of a statutory offence into several counts where it is made out by proof of acts of differing character, but all included in the statutory definition of the offence. It was a case where the defendants were indicted very much as in this case, under the second section of the act of March 3, 1835, (4 St. 776,—now Rev. St. § 5359,) for endeavoring to make a revolt or mutiny, etc., etc. The court says:

"It is practically unimportant whether the provisions of the second section are expounded as so many instances or methods in which the offence of an endeavor to make a revolt or mutiny may be manifested, or whether they are taken distributively, and understood to be so many separate and distinct offences, each being sufficient of itself to sustain an indictment. The three counts of this indictment are so framed as to secure to the United States the advantage of either construction. It appears to me, therefore, that the court did not err in instructing the jury that, if the acts charged in the indictment were satisfactorily sustained by the evidence, and if the defendant committed those acts with intent to resist the master in the free and lawful exercise of his authority on board of the vessel, they would amount, in law, to an endeavor to make a revolt." At pages 423, 424.

Reverting to the Alabama cases, before cited, it will be found that it was held that a common-law indictment for larceny could not sustain a conviction for the statutory offences described in the sections of the Penal Code already cited. So, here, a common-law indictment for larceny—if we had any such thing in our practice, as we have not, all our indictments being contrary to the form of the statute— would not do, showing plainly that, as in the Alabama cases, the indictment should charge the offence in the language of the statute; and it was done in those cases without the separation we have here into counts charging distinct offences, which I have endeavored to show was immaterial. It is the same in Tennessee. *State* v. *Callicutt*, 1 Lea. (Tenn.) 714. The form of indictment given under the English statute for plundering or stealing is a single count, charging that the defendant "did plunder, steal, take, and carry away, against the form," etc., etc. It is stated, however, that you may add separate counts distinguishing between "in distress" and "wrecked," etc. Arch. Crim. Pl. (4th Am. Ed.) 214; 2 Arch. Crim. Pl. (8th Am. Ed.) 1332. But there is no objection to stating the same offence in different ways in as many different counts as you may think necessary. 1 Arch. Crim. Pl. (6th Ed.) 93, and notes; Id. (8th Ed.) 292, and notes. And where the statute says the doing of this or that shall constitute the offence, the indictment may charge them all in one count, or in separate counts, at the election of the pleader. 1 Bish. Crim. Proc. (2d Ed.) §§ 436, 435, 434. But whatever form is adopted the verdict should be, in a case like this, general on the whole indictment, rather than separate on each count, and it is not error to so direct the jury as to relieve them of the confusion of finding a separate verdict for the different acts of the same offence, for all of which there was the same punishment. There may be cases of different grades, or punishment, or different offences, where the court should direct separate findings on the separate counts, but surely this is not one of them. 1 Bish. Crim. Proc. (2d Ed.) §§ 1005, 1009, 1010, 1011. And, where the offence may be charged in one count, reciting all the statutory acts or elements, it seems to me more fitting to find a general verdict, and not to confuse with asking the jury to point out the particular act by following the separation of the pleader. The evidence will indicate on which act the verdict is predicated, if it be at all material to know it, in the subsequent proceedings. I fail, therefore, to see any injury to the defendant in the directions on that point of which so much complaint has been made in the argument. The jury were properly told to find a general verdict, and it

is a mistake to treat the charge as altering the form of the pleadings or amalgamating the counts, though the language used might possibly be so construed. The object of the .court was to rule that there were not, as had been argued, separate and distinct offences, but one offence, which might be compassed by the doing of several acts, and that the doing of any one of them required a verdict of guilty. This being so, the defendant could not rightfully claim to be tried as if each act constituted a separate offence; and the real ground of complaint, on the motion for a new trial, is that the court did not so treat the case because the attorney for the government had so treated it in his pleading. I have endeavored to show that, conceding that there were charged separate offences, and not several acts of the same offence, a general verdict was still proper and lawful, though it would have been, in that case, correct to find a separate verdict on each count. Hence, in any view, no error has been committed for which a new trial should be granted.

We come, now, to the objection that the evidence of the confession was improperly admitted. I cannot see any reason why it should have been excluded. The witness Bennett was not in any proper view a person in authority; neither was Tarrant, the deputy marshal. In *Com.* v. *Tuckerman*, 10 Gray, 173, 190, the court states the rule to be that all confessions—

"Which are obtained by threats of harm or promises of favor and wordly advantage, held out by a person in authority, or standing in any relation from which the law will presume that his communications would be likely to exercise an influence over the mind of the accused, are to be excluded from the hearing of judicial tribunals." Again: "Whether the court improperly admits them cannot be determined by reference to judicial authorities, which can only supply the principle of law which is to constitute a standard of decision; but in every case the admissibility in evidence of confessions must depend upon the peculiar state of facts and circumstances existing in that case." Id. at p. 192; *Com.* v. *Morey*, 1 Gray, 461, 463; *U. S.* v. *Nott*, 1 McLean, 499.

The circumstances in *Tuckerman's Case, supra*, are instructive, but I shall not take space to relate them here. The confessions were made to a stockholder and director of the corporation injured by the embezzlement, and yet were admitted, although the promises were stronger than we have here. The court says:

"Thus, if an accused party has been made a prisoner, anything which may be said to him by the officer by whom he is held in custody will always be scrutinized with greatest care, and slight promises of favor coming from him will be considered a sufficient reason for rejecting all proof of subsequent confessions,

But the defendant was not under arrest, and no charge had been brought or complaint made against him at the time of his interview with Reed." At page 193.

The court then compares the men in their relations and respective intelligence, and refers to the capacity of the accused to know what he was doing, and declares that what was said must always be considered in the light of the accompanying circumstances, which are never to be lost sight of in determining whether the promises in threats were limited, explained, or qualified in their meaning by whatever else was said and done. See, also, *Com.* v. *Curtis*, 97 Mass. 474, 578; *Com.* v. *Whittemore*, 11 Gray, 202; *Com.* v. *Cuffie*, 108 Mass. 287; *Com.* v. *Smith*, 119 Mass. 311; *Com.* v. *Sego*, 125 Mass. 210. The cases in the federal courts substantially agree with these Massachusetts cases. *U. S.* v. *Nott, supra; U. S.* v. *Pocklington*, 2 Cranch, 293; *U. S.* v. *Kurtz*, 4 Cranch, 682; *U. S.* v. *Williams*, 1 Cliff. 5; *U. S.* v. *Graff*, 14 Blatchf. 381; *Montana* v. *McClin*, 1 Mont. 394; *Beery* v. *U. S.* 2 Col. Ter. 186, 203, in which there is an able dissenting opinion attacking the rule of exclusion and recommending its abandonment. Indeed, it is generally lamented that there is any exclusion of the evidence of confessions under any circumstances, although it is conceded that the rule has become too firmly established to be ignored. The Tennessee cases are likewise in accord with the best cases on the subject. *Beggarly* v. *State*, 8 Bax. 520; *Self* v. *State*, 6 Bax. 244; *Frazier* v. *State*, Id. 539; 2 King, Dig. (2d Ed.) § 184. And I have found no more exact statement of the law of the subject than that made by that learned and accurate writer, now Mr. Justice Stephen. He says:

" No confession is deemed to be voluntary if it appears to the judge to have been caused by any inducement, threat, or promise proceeding from a person in authority and having reference to the charge against the accused person, whether addressed to him directly or brought to his knowledge indirectly; and if (in opinion of the judge) such inducement, threat, or promise gave the accused person reasonable grounds for supposing that by making a confession he would gain some advantage or avoid some evil in reference to the proceedings against him. But a confession is not involuntary only because it appears to have been caused by the exhortations of a person in authority to make it as a matter of religious duty, or by an inducement collateral to the proceeding, or by inducements held out by a person not in authority. The prosecutor, officers of justice having the prisoner in custody, magistrates, and other persons in similar positions, are persons in authority." Steph. Dig. "Evidence," (May's Ed. 1877,) 72.

See, also, 1 Greenl. Ev. (12th Ed.) § 219 *et seq.*; 2 Ben. &

Heard, Lead. Crim. Cas. (2d Ed.) 484, 630; 2 Russ. Crimes, (8th Ed.) 824; 1 Whart. Crim. Law, (17th Ed.) § 683.

The real question is whether there has been any threat or promise of such a nature that the prisoner would be likely to tell an untruth from fear of the threat or hope of profit from the promise. Steph. Dig. "Evidence," p. 70, and note; *Reg.* v. *Reason,* 12 Cox, 228. And Chief Baron Kelly said: "The cases excluding confession, on the ground of unlawful inducement have gone too far for the protection of crime." Id. p. 73, and note; *Reg.* v. *Reeve,* 12 Cox, 179. The same thing was said by Baron Parke, and he further said that—

"He could not look at the decisions without some shame when he considered what objections had prevailed to prevent the reception of confessions in evidence, and that justice and common sense had been too frequently sacrificed at the shrine of mercy." *Reg.* v. *Baldry,* 5 Cox, 623; S. C. 2 Ben. & Heard, Lead. Crim. Cas. (2d Ed.) 484, 495.

Mr. Justice Earle said that the sacrifice was made, "not at the shrine of mercy, but at the shrine of *guilt.*" Id. I am aware that the cases on this subject are conflicting to that extent, that if we look only for precedents any given case can be ruled one way or the other, so often are the established distinctions overlooked. But I think the principle to be extracted from them amounts to this: The court will submit the confession to the jury for what it may be worth, in all cases where the threat or promise has been made by one having no authority over the prosecution for the offence, and will exclude it in all cases where there has been a threat or promise, of the nature above described, to one having such authority, or in his presence or by his sanction. There may be possible qualifications to this statement, as applicable to other circumstances, but it is sufficiently comprehensive to include the facts we have in hand. As I understand the law established by the cases that show the adjudication to have been made with careful consideration, the determination of the question of *authority* depends upon the relation of the person to a criminal prosecution for the act done by the accused. If some officious person, not at all so related to the prosecution for the crime, should, by threats or promises, extort a confession, it would be a question, not of the competency of the evidence for the judges to decide, but of its weight with the jury. The elements entering into the preliminary inquiry by the judge, where he is called on to determine the competency of the evidence, are these:

(1) Has the person to whom, or in whose presence, or by whose sanction, the alleged confession was made, any *authority?* (2) Were the threats or promises of that character that should exclude the confession as one made involuntarily?

Both these questions being answered in the affirmative, the evidence is excluded as a matter *of law,* the judge trying the facts as in other cases of mixed questions of law and fact; but either being answered in the negative, the evidence goes to the jury, and thereupon they try this as they do all the other facts of the case, giving such weight to the confession as they see fit. All evidence of confessions does not pass through this ordeal of trial by the judge, except to determine whether it belongs to the one class or the other; for if they have been made to persons not in authority, whether voluntarily or involuntarily, they go to the jury, to be by them discarded if *they* find that they have been extorted by threats or induced by promises of that kind that "the prisoner would be likely to tell an untruth from fear of the threat or hope of profit from the promise."

It would be going too far, perhaps, to say that the term *"confession"* implies, somewhat in the nature of the word, an acknowledgment of guilt to one in authority, not competent as evidence, if the judge sees that the person in authority has taken advantage of his position to extort or induce it; while such acknowledgment to one not in authority is merely an *admission* or *declaration* of the party, receivable in evidence precisely as in civil cases, to be valued by the jury according to circumstances. But the inexactness is more philological than technical, and this, because the two terms are ordinarily used to distinguish between *civil* and *criminal* cases, more as a matter of convenience than anything else. 1 Greenl. Ev. § 213. But when we come to classify *confessions,* when so broadly used, we find a need of some further division than that of *judicial* and *extrajudicial.* Id. § 216. Because, whether the given case falls within the one or the other of the classes as defined by Mr. Greenleaf, we find that it is subject to the distinctions above adverted to, unless we treat all confessions made to one in authority as *judicial*—which in a broad sense they are—and do not limit that class, as he does, to those "made before a magistrate, or in court, in the due course of legal proceedings." Otherwise, *extrajudicial* confessions, as defined by that learned author, must be again distinguished into those made to persons in authority over the prosecution and those made to such as are not. *Authoritative* and *unauthoritative, official* and *extraofficial,* may be suggested as sufficiently comprehensive to designate the distinctions between the two, though I should prefer—following a not unnatural signification of the terms—to limit *confessions* to that acknowledgment of guilt made to any person in authority over the prosecution,

and·call all others *admissions*. Speaking of *extrajudicial* confessions, Mr. Greenleaf says:

" "All confessions of this kind are receivable in evidence, being proved like other facts, to be weighed by the jury." 1 Greenl. Ev. § 216.

Again:

" Before any confession can be received in evidence in a criminal case, it must be shown that it was *voluntary*." Id. § 219.

Now, manifestly, these two statements of the texts are not only inaccurate, but conflicting, unless attention is given to the limitation to which I have just alluded; and with such attention they are both accurate· and harmonious, and abundantly supported by the best-considered cases. Some such classification will greatly aid in understanding the cases, and serves to somewhat clear up the confusion attending the subject throughout any investigation of it.

The case of *Beggarly* v. *State, supra,* contains, in the opinion of a very able judge, intimations of an adherence to the rule suggested by Mr. Greenleaf as the wiser one, though, confessedly, not the one established by the later cases, that all confessions, whether made to persons in authority or not, must be entirely excluded *by the judge,* if it appear to him that the threats or promises used were sufficient to overcome the mind of the accused. 1 Greenl. Ev. § 223. (12th Ed. by Redfield,) and note.

In *Beggarly's Case, supra,* it is said:

"In regard·to the person by whom the inducements were offered there has been conflict in the authorities—some holding that the inducements held out by private persons, not being prosecutor, officer, or having any authority over the prisoner, are not sufficient to exclude confessions thus obtained; but the sounder rule manifestly is that this is a mixed question of law and fact for the judge, and while it is proper to note the difference between confessions obtained by prosecutor, officer, or person in authority, and those obtained by private persons, yet, if in fact the confessions were forced from the prisoner through hope or fear presented to his mind by a third person, it should be rejected." Page 526.

This was said in regard to an occurrence that did not result in any confession, but a denial of guilt, the adjudication turning upon the admissibility of *subsequent* confessions received in evidence in the court below, and sustained because the prisoner had been warned and all the influence of that occurrence removed, as the court determined. But, as to the occurrence itself, if confession had resulted, as suggested by the court, it would have been as well rejected·because the inducements were sanctioned· by one in authority, the magistrate, namely. It is true the magistrate did not talk to the prisoner, on account of a

delicacy he felt about his official position, but the accused was in custody before him, and while the examination was in progress, by his consent, and, as I infer, by his instigation, the prisoner was taken out by the witness for the very purpose of inducing a confession, the magistrate instructing the witness "to tell him about turning state's evidence." This was really making the person talking to the prisoner an agent of the magistrate to do what he felt a delicacy in doing, and, under the circumstances of the case, it fell clearly within the rule of inducements held out by the sanction of one in authority, which are as fatal to the evidence as if held out by himself. 2 Ben. & Heard, Lead. Crim. Cas. 576, 516, and cases cited; *Reg.* v. *Taylor,* 8 C. & P. 733; S. C. 34 E. C. L. 608; *Reg.* v. *Sleeman,* 6 Cox, 245, and other cases cited; 3 Jac. Fish. Dig. 3712. It does not appear whether the case of *Reg.* v. *Moore,* 2 Den. 522; S. C. 12 Eng. Law & Eq. 583; S. C. 2 Ben. & Heard, Lead. Cas. 499, was called to the attention of the court, but it certainly resolves the conflict mentioned in the above extract and by Mr. Greenleaf in favor of the admissibility of all confessions made to a third person not in authority, to be weighed by the jury according to the circumstance of each case. It was so understood by the learned annotator of Greenleaf's Evidence, in the edition already cited, and by the text writers since that case was reported, and by the learned judge in *Com.* v. *Smith,* 10 Gratt. 734,—one of the ablest expositions of the law of the subject I have found, and which has come under my observation since the foregoing portion of this opinion was written. See, also, *Wolf* v. *Com.* 30 Gratt. 833, where the case was affirmed. I cannot, therefore, consider these expressions in *Beggarly* v. *State* as establishing the doctrine contended for as the rule of evidence in Tennessee, even if, as such, it were binding on this court, which it probably is not. *U. S.* v. *Reid,* 12 How. 36.

When we come to determine who are persons in authority, in the sense of the rule above indicated, I do not know how better to express my judgment on the question than to adopt that of the learned judge in *Com.* v. *Smith, supra.* It was contended by the learned counsel in this case that the fact that a master or mistress could be such person in authority, would show that any kind of domination would answer the rule, and that *official* authority was not essential as an element in determining the question. It might be a sufficient answer to this to say that the facts here do not show that Bennett had that domination over the mind of Stone to bring the case within the rule as thus indicated. The authorities already cited demonstrate that

the person must have some authority over the prosecution of that particular offence, whether he be an officer of the law or not. The mere fact that he is an officer does not answer the purpose; he must be connected with the prosecution, and have authority through that connection over the prisoner. *Reg.* v. *Moore, supra; Com.* v. *Smith, supra.* I do not think it is necessary that the legal proceedings shall have actually commenced, but they must be impending or contemplated, and, perhaps, under the strict rule, the accused must, in some way, be in the actual custody of the person in authority, or suppose himself so to be. The cases of master or mistress occupying that relation will be found to be where the offence concerned them in their persons or property, and it does not arise alone out of their attitude of master or mistress. *Reg.* v. *Moore, supra; Com.* v. *Smith, supra.* Not even does the relation of a parent to a child of tender years brings the case within the rule where the parent is unaffected by the crime. *The Queen* v. *Reeve,* L. R. 1 C. C. 362.

It was said that Bennett was a detective and also the agent of the owners of the goods, and stood for them in the relation of prosecutor. It is to be first observed that he was not a police officer, although he calls himself *a detective,* but only a private agent employed, not to prosecute the crime, or to procure evidence for that purpose, but to gather up the goods or their value. He undoubtedly, during the progress of that employment, sought to influence the parties by suggestions of prosecution under the federal statutes, which he printed and circulated; but, as I understand the evidence, not till after the alleged confession of the defendant in this case. And at that time he had been advised by counsel, if I remember the testimony, and by the assistant United States district attorney, that no prosecution would lie in this court. But take all he said at the strongest, and it may well be doubted, if he had been in authority over the prosecution, whether the confession would be excluded under the latest cases. *The Queen* v. *Jarvis,* L. R. 1 C. C. 96; *The Queen* v. *Reeve,* Id. 362. But I did not place my judgment on this ground, but on the more substantial one that he occupied no such relation to the prosecution as would exclude the evidence of the confession; conceding that it would have been excluded if he had been in authority. We have in our courts no such *quasi* officer as a prosecutor, as known to the common law and our state practice. At common law some person, generally the party injured, though it might be another person, must bo named as prosecutor, except in special cases. And without this there could be no prosecution. 1 Arch. Crim. Pr. (8th Ed.) 245, an l

notes; Id. (6th Ed.) 47, 52, 79, and notes; 1 Bish. Crim. Pr. (3d Ed.) § 690. And the Code of Tennessee has the same requirement. T. & S. Code, (Tenn.) § 5096. It is through this *semi*-official relation to the prosecution that a private prosecutor becomes a person in authority in this matter of the evidence of confessions. But under our federal practice from the earliest times, and by force of the statute, the district attorney is the only prosecutor known to our law; and as a matter of fact, in this court, at least, no private prosecutor has ever been recognized. Act of 1879, *c*. 20, § 35, (1 St. 92;) Rev. St. § 771; *U. S.* v. *Mundel*, 6 Call, (Va.) 245, 247; *U. S.* v. *McAvoy*, 4 Blatchf. 418; *U. S.* v. *Blaisdell*, 3 Ben. 132, 143, where the court refused to recognize an agreement of the executive department not to prosecute the offender, and said that "when there is no district attorney in commission, the government cannot prosecute in this court." 1 Bish. Crim. Pr. § 278 *et seq.* It is impossible, therefore, for any one to occupy the place of a private prosecutor in this court, or to make any promises of immunity that will avail the accused in that capacity. It was otherwise at common law; for, generally, if the party injured refused to prosecute, there could be no prosecution. With us the district attorney alone can give such assurances. Neither Bennett or his principals could, therefore, have such authority over the prosecution as to bring them within the rule we are considering. Being owners of the goods, without this capacity to control the prosecution, through the necessity of becoming prosecutor, does not answer to make them persons in authority. 1 Whart. Crim. Law, (7th Ed.) § 692; Id. § 686; *Ward* v. *People*, 3 Hill, (N. Y.) 395. The case of *Frain* v. *State*, 40 Ga. 529, stating a contrary doctrine, is predicated upon a statute regulating the subject which abolishes all distinctions between persons in and not in authority. The statute is quoted in *Earp* v. *State*, 55 Ga. 136; S. C. 1 Am. Crim. Rep. 171. The *State* v. *Brockman*, 46 Mo. 566, is within the rule, because the owner of the goods was a prosecutor. In the *State* v. *Hogan*, 54 Mo. 192, the witnesses were the officers of the law concerned in the prosecution. It does not appear in *State* v. *Lawhorne*, 66 N. C. 638, how or by whom the confessions were obtained, and the case involved the admissibility of subsequent confession; while in *State* v. *Whitfield*, 70 N. C. 356, the owner was the prosecutor. In *Flagg* v. *People*, 40 Mich. 706, the prisoner was in arrest and under the control of the officers having him in custody. These are the particular cases so much pressed by counsel, but I do not see that they militate against the views I have here expressed.

In regard to Tarrant, the deputy marshal, his mere presence, without more, would not invalidate the confession. He must be in authority over the prosecution and prisoner, and sanction the threat or promise held out by others. See the cases mentioned in the comments on *Beggarly's Case, supra;* 1 Whart. Crim. Law, (7th Ed.) § 692, at p. 609; *State* v. *Gossett,* 9 Rich. (S. C.) Law, 428; *State* v. *Cook,* 15 Rich. (S. C.) Law, 29; *Wiley* v. *State,* 3 Cold. (Tenn.) 362. He was present only in his character as the assistant of Bennett. I have no doubt they both relied upon his official position as an aid in procuring settlements for the goods taken from this wreck; but Tarrant was not using his official powers, if he had any, to extort or elicit this confession. He had no warrant of arrest, and was neither attempting nor threatening to make an arrest, and there was no cause for the defendant to reasonably suppose that he had any authority to hold out inducements or to sanction those held out by Bennett.

Finally, I may say that, while the courts are constantly lamenting that there is any rule that excludes the evidence of confessions or admissions of guilt in any case from the consideration of the jury, who have just as much capacity to weigh the facts of duress or inducement as they have any other facts in the case, and who finally in all cases pass upon the question, not of admissibility, but of duress or inducement, whenever the judge does admit the proof, I see no reason why the rule should be extended in the least beyond the established law of the cases. In this case I fully submitted to the jury the determination of the weight they would give to the evidence, and I have no doubt, if there was any threat or inducement to impair the testimony, the defendant received the full benefit of it. He could have been properly convicted upon his own testimony before the jury without the confessions; still, if they were improperly admitted, be would be entitled to a new trial. *U. S.* v. *De Quilfeldt,* 5 FED. REP. 276. Hence I have given the subject a careful examination, and am satisfied the evidence was properly admitted. The other requests refused need not be especially noticed. They are on the face of them not in accordance with the views I have taken of the statute and the law of the case as here expressed, and after thorough reconsideration I am of opinion a new trial should be refused.

Motion overruled.

NOTE. Of the 51 indictments found by the grand jury for plundering the wreck of the City of Vicksburgh, 10 were disposed of by conviction subse-

quently to the rulings in this case, 7 by acquittal, and 11 were dismissed by the district attorney.

The ruling made at the trial of this case, on the authority of the New York cases, permitting the defendant to testify as to his own intention in taking the goods, receives confirmation in the case of *Greer* v. *Whitfield,* 4 Lea. (Tenn.) 85, appearing since the trial.